WISCONSIN HOSPITAL ASSOCIATION, Wisconsin
Manufacturers & Commerce, Printing Industries of
Wisconsin, Wisconsin Paper Council, United Foun-
drymen of Wisconsin, and Wisconsin Wood Products
Manufacturers, Plaintiffs-Appellants,

A. O. SMITH CORPORATION, American Petroleum
Institute, Amity Leather Products Company, Berlin
Foundry Corporation, Briggs & Stratton Corporation,
The Buckstaff Company, Eck Industries, Inc., The
Falk Corporation, Freeman Chemical Corporation,
General Electric Company, Grede Foundries, Inc., Min-
nesota Mining & Manufacturing Company, Motor
Castings Company, Neenah Foundry Company, Pelton
Casteel, Inc., Shawano Community Hospital, and
Young Radiator Company, Plaintiffs-Intervenors-
Appellants,

v.

NATURAL RESOURCES BOARD and Department of
Natural Resources, Defendants-Respondents,

CITIZENS FOR A BETTER ENVIRONMENT, John
Muir Chapter-Sierra Club, League of Women Voters,
Inc., and Wisconsin's Environmental Decade, Inc.,
Intervenors-Respondents.

Court of Appeals

*No. 89-0420. Orally argued August 24, 1989.—Decided May 17,
1990.*

688

(Also reported in 457 N.W.2d 879.)

690

For the plaintiffs-appellants Wisconsin Hospital Association and plaintiffs-intervenors-appellants Shawano Community Hospital the cause was submitted on briefs of *Debra J. Waite,* general counsel, of Madison. Oral argument by *Jon P. Axelrod* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.*

For the plaintiffs-appellants Wisconsin Manufacturers and Commerce, Wisconsin Paper Council and Wisconsin Wood Products Manufacturers the cause was submitted on briefs of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* by *Jon P. Axelrod* and *Paul G. Kent,* of Madison. Oral argument by *Jon P. Axelrod.*

For the plaintiffs-appellants Printing Industries of Wisconsin the cause was submitted on briefs of *Foley & Lardner* by *Mark A. Thimke,* of Milwaukee. Oral argument by *Jon P. Axelrod* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.*

For the plaintiffs-appellants United Foundrymen of Wisconsin the cause was submitted on briefs of *Cook & Franke* by *Pamela H. Schaefer,* of Milwaukee. Oral argument by *Jon P. Axelrod* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.*

For the plaintiffs-intervenors-appellants American Petroleum Institute the cause was submitted on briefs of *Lathrop & Clark* by *Donald Heaney* and *Michael J. Lawton,* of Madison; and, *G. William Frick* and *Ralph*

*J. Colleli, Jr.,* of counsel, of Washington, D.C. Oral argument by *Donald Heaney.*

For the plaintiffs-intervenors-appellants Minnesota Mining & Manufacturing, Inc. the cause was submitted on briefs of *Quarles & Brady* by *Michael S. McCauley, Ralph Topinka* and *Erica Eisinger,* of Madison. Oral argument by *Jon P. Axelrod* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.*

For the defendants-respondents Natural Resources Board and Department of Natural Resources the cause was submitted on briefs of *Donald J. Hanaway,* attorney general, with *Mary V. Bowman,* assistant attorney general; and, *Thomas F. Steidl,* Department of Natural Resources Bureau of Legal Services. Oral argument by *Mary V. Bowman.*

For the intervenors-respondents Citizens for a Better Environment, John Muir Chapter-Sierra Club, League of Women Voters, Inc., and Wisconsin's Environmental Decade, Inc. the cause was submitted on briefs of *Susan R. Mudd.* Oral argument by *Susan R. Mudd.*

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

GARTZKE, P.J. The plaintiffs are hospital and industrial associations and their member business corporations.[1] They appeal from an order on summary judg-

---

[1]The associations are Wisconsin Hospital Association, Wisconsin Manufacturers and Commerce, Printing Industries of Wisconsin, Wisconsin Paper Council, United Foundrymen of Wisconsin, Wisconsin Wood Products Manufacturers and American Petroleum Institute. The member corporations who intervened as plaintiffs are: A. O. Smith Corporation, Amity Leather Products Company, Berlin Foundry Corporation, Briggs & Stratton Corporation, The Buckstaff Company, Eck Industries, Inc., The Falk Corporation, Freeman Chemical Corporation, General Electric

ment. The order declares the validity and constitutionality of a state administrative rule entitled "Control of Hazardous Pollutants," Wis. Adm. Code ch. NR 445 (Sept. 1988), and dismisses plaintiffs' claims that the rule is not statutorily authorized and denies the hospitals equal protection of the laws. The Wisconsin Department of Natural Resources (DNR), which adopted the rule, and the Natural Resources Board are the defendants.[2] Four groups have intervened as respondents.[3]

We affirm that part of the order dismissing the plaintiffs' claim that DNR lacks statutory authority to adopt the rule. We reverse that part dismissing the hospitals' equal protection claim and that part declaring the rule is valid. The equal protection issue must be tried. The result of our mandate is that all plaintiffs except Wisconsin Hospital Association and Shawano Community Hospital are out of this action.

## A. BACKGROUND

The legislature's authorization to DNR to adopt the rule is sec. 144.375(5), Stats., which provides in relevant part:

> (a) If an emission standard for a hazardous air contaminant is promulgated under section 112 of the federal clean air act, [42 U.S.C. sec. 7412,] the department shall promulgate by rule a similar standard but

Company, Grede Foundries, Inc., Minnesota Mining and Manufacturing Company, Motor Castings Company, Neenah Foundry Company, Pelton Casteel, Inc., Shawano Community Hospital, and Young Radiator Company.

[2] The board directs and supervises DNR. Sec. 15.34, Stats.

[3] The intervenor-respondents are Citizens for a Better Environment, John Muir Chapter-Sierra Club, League of Women Voters, Inc., and Wisconsin's Environmental Decade, Inc.

this standard may not be more restrictive in terms of emission limitations than the federal standard . . ..

(b) If an emission standard for a hazardous air contaminant is not promulgated under section 112 of the federal clean air act, the department may promulgate an emission standard for the hazardous air contaminant if the department finds the standard is needed to provide adequate protection for public health or welfare.

"Emission standard" is defined in sec. 144.30(11), Stats., as "a requirement which limits the quantity, rate or concentration of emissions of air contaminants on a continuous basis. An emission . . . standard includes a requirement relating to the operation or maintenance of a source to assure continuous emission reduction."

The purpose of the rule is "to establish emission limitations for hazardous pollutants." Wis. Adm. Code sec. NR 445.01(2). It "applies to all air contaminant sources and to all owners or operators of an air contaminant source." Sec. NR 445.01(1). It sets emission limitations for 405 substances. The emission limitations do not apply to a contaminant source which must meet a national emission standard for a pollutant under sec. 112 of the federal clean air act. Sec. NR 445.01(1).

Most substances covered by the rule are subject to emission limitations based upon standards established for indoor air by the American Conference of Governmental Industrial Hygienists. The rule divides these 329 substances into three groups. Wis. Adm. Code sec. NR 445.04 Tables 1, 2, and 4. Table 1 covers "Hazardous Air Contaminants With Acceptable Ambient Concentrations." Table 4 covers other such contaminants but assigns to them a different compliance schedule than the Table 1 contaminants for existing sources. Table 2 lists "Hazardous Air Contaminants Which Are Pesticides,

697

Rodenticides, Insecticides, Herbicides or Fungicides with Acceptable Ambient Concentrations."

For each substance in Tables 1, 2, and 4, the American Conference of Governmental Industrial Hygienists had previously recommended a form of emission limitation—"threshold limit values"—applicable to indoor working conditions. The hygienists divided these "values" into a "threshold limit value—time weighted average" (TLV–TWA) and a "threshold limit value—ceiling" (TLV–C). DNR's rule uses those threshold limits as a basis for regulating outdoor concentrations of Table 1, 2, and 4 substances. Sources may not emit regulated substances "to cause ambient air concentrations off the source's property which exceed" either of two limits. The offsite-outdoor concentration for any contaminant may not exceed 2.4% of the TLV–TWA for that contaminant over any consecutive 24-hour period or 10% of the TLV–C for any one-hour averaging period. Wis. Adm. Code secs. NR 445.04(1) and (2), 445.05(1), (2), and (4).

The remaining seventy-six of the 405 substances covered by the rule are known or suspected carcinogens. These substances are listed in Wis. Adm. Code sec. NR 445.04 Table 3. The rule establishes emission limitations based on a "best available control technology" (BACT) limitation for some of the carcinogens and a "lowest achievable emission rate" (LAER) limitation for the others.

The BACT limitation sets an "emission limit for a hazardous air contaminant based on the maximum degree of reduction practically achievable as specified by the department on an individual case-by-case basis taking into account energy, economic and environmental impacts and other costs related to the source." Wis. Adm. Code sec. NR 445.02(4). The LAER limitation sets a rate which is the more stringent of

(a) The most stringent emission limitation for the hazardous air contaminant which is contained in the air pollution regulatory program of any state for this class or category of source, unless an applicant for a permit demonstrates that this limitation is not achievable; or

(b) The most stringent emission limitation for the hazardous air contaminant which is achieved in practice by the class or category of source.

Sec. NR 445.02(8).

DNR adopted the rule after five years of study and public hearings by DNR, the Natural Resources Board, and a seven-member Hazardous Emissions Task Force appointed by the secretary of DNR. Rather than conducting new research to determine which substances should be regulated, those organizations relied on studies performed by other scientific bodies. On May 25, 1988, the Natural Resources Board adopted the rule upon finding that:

WHEREAS, the Natural Resources Board has heard ample testimony and is aware of sound scientific data relating to the harmful effects of hazardous air contaminants on public health and welfare; and the Board is aware of the inadequate efforts by [the United States Environmental Protection Agency (EPA)] to promulgate emission standards for hazardous air contaminants under section 112 of the federal Clean Air Act; and

WHEREAS, the Natural Resources Board finds that *it is necessary to promulgate emission standards for hazardous air contaminants not regulated under section 112 of the federal Clean Air Act in order to provide adequate protection for public health and welfare.*

NOW, THEREFORE, the Natural Resources Board adopts the rule proposed . . . which establishes standards for hazardous air contaminants which are not currently regulated under section 112 of the federal Clean Air Act . . .. [Emphasis added.]

The rule was to go into effect on October 1, 1988 for new or modified sources of contaminants. Wis. Adm. Code sec. NR 445.04(1). For existing sources, the rule establishes phased compliance schedules into 1994. Sec. NR 445.05(6). The circuit court partially stayed enforcement of the rule by moving back initial compliance dates a few months for those plaintiffs wishing to take advantage of the partial stay.

## B. STANDING

The intervenors-respondents contend that the plaintiffs (except American Petroleum Institute) lack standing to bring this action.

"Standing" is usually a matter of judicial policy. *See Wis. Bankers Ass'n v. Mut. Savings & Loan,* 96 Wis. 2d 438, 444 n. 1, 291 N.W.2d 869, 873 (1980) (Wisconsin courts generally require that a plaintiff possess standing not as a jurisdictional prerequisite but as a matter of sound judicial policy). In this case, however, the plaintiffs seek a declaratory judgment in a ch. 227, Stats., review of an administrative rule. Lack of standing deprives the trial court of subject-matter jurisdiction in a ch. 227 review. *Fox v. DHSS,* 112 Wis. 2d 514, 537–38, 334 N.W.2d 532, 543 (1983). Whether a plaintiff has standing is a question of law which we decide independently of the trial court's views. *State v. Wisumierski,* 106 Wis. 2d 722, 733, 317 N.W.2d 484, 489 (1982).

Standing in a ch. 227, Stats., review of an administrative rule depends on whether the challenger comes

within the statute authorizing judicial review. The controlling statute is sec. 227.40(1), which provides that an action for declaratory judgment is the exclusive means of judicial review of an administrative rule and further provides:

> The court shall render a declaratory judgment in such action only when it appears from the complaint and the supporting evidence that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff.

Although the plaintiff associations do not claim that the challenged DNR rules or their threatened application interfere with rights and privileges of any of the associations, each association alleges that many of its members will be subject to the rule. The number of members for each association is alleged to range from seventeen to 3,000. The business associations collectively claim that the rule requires Wisconsin industry to spend millions of dollars to control air emissions without any showing that such controls will have a positive effect on public health. The hospital association claims that Wisconsin hospitals who incinerate infectious waste will be forced to spend millions of dollars to achieve the lowest achievable emission rate of carcinogens.

Thus, the plaintiff associations bring this action as the representatives of their members. Section 227.40(1), Stats., is silent with respect to the right of an association as the representative of its members to bring an action for declaratory judgment to challenge a rule.

However, associations have been held to possess standing to bring a ch. 227, Stats., action to challenge an administrative decision on behalf of its members. Indeed, one such action was brought by Wisconsin's

Environmental Decade, Inc. (WED), an intervenor-respondent in this case. WED's standing to bring a ch. 227 action to challenge an administrative order was established in *Wisconsin's Environmental Decade, Inc. v. PSC,* 69 Wis. 2d 1, 230 N.W.2d 243 (1975) (*WED* ). In that case, the issue was whether WED's petition for review in a ch. 227 action contained facts showing that WED was aggrieved and directly affected by a decision of the Public Service Commission.

The *WED* court adopted a two-element standing analysis gleaned from the federal courts.

> The first step under the Wisconsin [standing] rule is to ascertain whether the decision of the agency directly causes injury to the interest of the petitioner. The second step is to determine whether the interest asserted is recognized by law.

*Id.* at 10, 230 N.W.2d at 248. The court held that:

> WED's members, who are customers in the area affected by the PSC's order in this case, have a sufficient interest under the cited sections of ch. 196, Stats., in the future adequacy of their service, and that WED has standing, if the facts alleged in the petition are true, to challenge the PSC's failure to consider conservation alternatives to the proposed priority system.

*Id.* at 17, 230 N.W.2d at 251.

*WED* is conclusive on the standing issue, even though that case did not involve a challenge to an administrative rule. Standing for purposes of challenging an administrative decision is similar to the statutory requirements to challenge an administrative rule. It is impossible to reconcile *WED* with a holding that the associations lack standing to bring the instant action.

We conclude they possess standing based on the interests of their members.

The industrial business corporations and hospital who intervened also have standing. Those plaintiffs in their complaint incorporate the allegations of the associations concerning harm. While the allegations are clumsy, we conclude they are sufficient to give the intervenors standing.

### C. PROCEDURAL STATUS: SUMMARY JUDGMENT

The plaintiff hospital and industrial associations and their member business corporations appeal from an order on summary judgment declaring the validity and constitutionality of the rule and dismissing the claims in their complaint alleging that the rule is invalid and unconstitutional.

The complaint asserts that it brings an action for declaratory judgment pursuant to sec. 227.40, Stats., to challenge the validity of the rule and that the rule (1) exceeds DNR's statutory authority, (2) violates the due process clauses of the United States and Wisconsin Constitutions because of a lack of adequate evidence to support it, and (3) violates the equal protection clauses of the constitutions as to the members of the hospital association, in that Wis. Adm. Code sec. 445.05(5) subjects hospital incinerator emissions to different standards than other air contaminant sources.

The answer of the Natural Resources Board and DNR in substance denies the allegations of the complaint and affirmatively requests judgment declaring the rule to be "valid in all respects."

On November 17, 1988, plaintiffs filed motions for summary judgment. So far as is material to our discus-

sion at this point, the motions assert simply that "there is no genuine issue as to any material fact and plaintiffs are entitled to judgment as a matter of law on the first and third claims." On the same date, defendants filed their motion for summary judgment on the same claims, that the rule is invalid for want of authority and unconstitutional on equal protection grounds, "on the grounds that there is no genuine issue of material fact and defendants are entitled to said judgment as a matter of law." Defendant's motion was no more specific than we have quoted.

On February 8, 1989, the trial court entered an order granting defendants' motion for summary judgment, denying the plaintiffs' motions for summary judgment and dismissing claims one and three of the complaint. While the court's order granting defendants' motion for summary judgment does not so specify, we construe it to grant relief in conformity with the prayer for relief in the answer, namely, a declaration that the rule is valid in all respects. At plaintiffs' request, the court later dismissed the due process claim without prejudice.

### D. *LIBERTY HOMES'* ANALYSIS OF CHALLENGES TO ADMINISTRATIVE RULES

We next take up the parties' cross-motions for summary judgment concerning the validity of the rule. Any of three circumstances requires a court to declare an administrative rule invalid: (1) the rule violates constitutional provisions; (2) it exceeds the statutory authority of the agency; or (3) the agency adopted it without compliance with statutory rulemaking procedures. *Liberty Homes, Inc. v. DILHR,* 136 Wis. 2d 368, 373, 401 N.W.2d 805, 807 (1987). An issue raised regarding the validity of a challenged rule must fall within one of these

circumstances. For that reason, the *Liberty Homes* court directed that the parties attacking an administrative rule "clearly state which type of challenge" is made and the applicable standard of review. *Id.* at 377, 401 N.W.2d at 809. A challenge based on an inadequate factual basis in the record to support a rule is a constitutional due process claim. *Id.*

We turn to plaintiff's claim that DNR lacks statutory authority to adopt the rule, leaving the equal protection issue for later analysis.

### E. CHALLENGE TO STATUTORY AUTHORITY TO ADOPT RULE

1. *Scope of Review*

"In determining whether an administrative agency has exceeded its statutory authority in promulgating a rule, we must look to the enabling statute to determine whether there is express or implied authorization for the rule." *In Interest of A.L.W.,* 153 Wis. 2d 412, 417, 451 N.W.2d 416, 418 (1990). This is a matter of statutory interpretation or construction. As such, it is a question of law which we resolve without deference to the view of the trial court. *Sauer v. Reliance Insurance Company,* 152 Wis. 2d 234, 240, 448 N.W.2d 256, 259 (Ct. App. 1989). If the claim in plaintiff's complaint has no basis in law, then the trial court properly denied plaintiffs' motions for summary judgment on that claim and properly granted defendants' motion for summary judgment dismissing the claim. *Kane v. Employer's Ins. of Wausau,* 142 Wis. 2d 702, 705, 419 N.W.2d 324, 326 (Ct. App. 1987).

To "expressly" authorize a rule, the enabling statute need not spell out every detail of the rule. If it did, no

rule would be necessary. Accordingly, whether the exact words used in an administrative rule appear in the statute is not the question. Rather, the reviewing court should identify the elements of the enabling statute and match the rule against those elements. If the rule matches the statutory elements, then the statute expressly authorizes the rule. The Wisconsin Supreme Court has implicitly followed this procedure in *Kimberly-Clark Corp v. Public Service Comm.*, 110 Wis. 2d 455, 461–62, 329 N.W.2d 143, 146 (1983), and *Peterson v. Natural Resources Board*, 94 Wis. 2d 587, 592–95, 288 N.W.2d 845, 848–49 (1980).

The elements of sec. 144.375(5)(b), Stats., are: (1) DNR promulgates an emission standard, i.e., a requirement which limits the quantity, rate, or concentration of emissions of air contaminants on a continuous basis, the definition contained in sec. 144.30(11), (2) for a hazardous air contaminant, (3) upon a finding by the department that the standard is needed to provide adequate protection for public health or welfare, and (4) an emission standard for the hazardous air contaminant has not been promulgated under sec. 112 of the federal clean air act.

DNR suggests that a reviewing court should defer to the agency's practical interpretation of the enabling statute as having authorized it to promulgate the rule. DNR bases its argument for deference on the federal standard of review in statutory authority cases announced in *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

The *Chevron* Court held that if Congress has ambiguously expressed its intent, a reviewing court must uphold the agency's interpretation if it "is based on a permissible construction of the statute." *Id.* at 843. The Court deferred to the agency's reasonable construction of

the statute granting it rule-making authority. *Id.* at 866. The United States Supreme Court followed *Chevron* and again deferred to an agency's construction in *Young v. Community Nutrition Institute,* 476 U.S. 974 (1986).[4]

We, however, find no ambiguity in the enabling statute before us, sec. 144.375(5)(b), Stats. Whatever the merits of a deferential review when the enabling statute is ambiguous, we need not decide whether to employ it here.

Some issues stated by appellants in terms of statutory authority pertain to the factual adequacy of the record to support the rule.[5] Except as they bear on the equal protection claim, the factual inadequacy issues left this case when the trial court dismissed appellant's due

---

[4]*Chevron* is discussed at length in the law reviews. *See, e.g.,* Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 Duke L.J. 511; Farina, *Statutory Interpretation and the Balance of Power in the Administrative State,* 89 Colum. L. Rev. 452 (1989); Shapiro & Glicksman, *Congress, The Supreme Court, and the Quiet Revolution in Administrative Law,* 1988 Duke L.J. 819, 858–62; Pierce, *Two Problems in Administrative Law: Political Polarity on the District of Columbia Circuit and Judicial Deterrence of Agency Rulemaking,* 1988 Duke L.J. 300, 312–13; Pierce, *Chevron and its Aftermath: Judicial Review of Agency Interpretations of Statutory Provisions,* 41 Vand. L. Rev. 301 (1988). Judge Ruth Bader Ginsberg has discussed *Young* and the difficulties suffered by the judiciary in gleaning legislative intent. Ginsberg, *A Plea for Legislative Review,* 60 S. Cal. L. Rev. 995, 997–98 (1987).

[5]The *Liberty Homes* court said that "persons asserting that a rule is factually unsupported could argue that in adopting such a rule the agency exceeded its statutory authority," but that the argument had not been made. *Liberty Homes,* 136 Wis. 2d at 374–75 n.6, 401 N.W.2d at 808. Nor is the argument made here. *Liberty Homes* involved a constitutional challenge to a rule, not a challenge to the agency's authority to adopt the rule. *Id.*

process claim. As we have said, a factual inadequacy challenge is a due process claim. *Liberty Homes,* 136 Wis. 2d at 377, 401 N.W.2d at 809. We identify those issues as they arise.

### 2. *Single Finding for Numerous Contaminants*

The enabling statute, sec. 144.375(5)(b), Stats., authorizes DNR to "promulgate an emission standard for the hazardous air contaminant if the department finds the standard is needed to provide adequate protection for public health or welfare." DNR did not make a separate finding to that effect for each of the 405 substances. Rather, it made a single finding applicable to all of the substances. In addition to asserting that the finding is deficient in other respects, appellants contend that sec. 144.375(5)(b) requires a specific finding *as to each substance.*

Plaintiffs' argument is best explained by their example involving ammonia, a regulated substance. They argue that sec. 144.375(5)(b), Stats., requires DNR to issue a written finding that a specific emission limitation as to

> *ammonia* is needed to provide adequate protection for public health or welfare. Such a finding necessarily requires a process by which the public health or welfare need for an *ammonia* limit is determined. Here the DNR has failed on two counts. First, it has not issued a written finding *for ammonia.* Second, it has not based the standard in the Rule on a specific determination that the standard is needed to provide adequate protection for public health or welfare. [Emphasis added.]

We deal here with the first claimed failure—no written finding as to ammonia—and reject it.

The issue turns on the meaning of the finding element in sec. 144.375(5)(b), Stats. When determining the meaning of a statute, we must avoid absurd readings. *In Interest of T.L.,* 151 Wis. 2d 725, 731, 445 N.W.2d 729, 732 (Ct. App. 1989). Plaintiffs' reading would require separate findings as to each of the 405 substances. Such a reading is absurd on its face.

Under the only reasonable reading of sec. 144.375(5)(b), Stats., DNR's finding that an emission standard is needed as to a group of substances is a finding that the standard is needed as to each substance in the group. The statute unambiguously permits such a finding and we therefore look no further to determine the legislature's intent.

### 3. *Sufficiency of Finding that Standards are Needed*

We turn to plaintiffs' second argument, regarding the sufficiency of DNR's findings. Plaintiffs assert that the defect they complain of in the finding does not pertain to the number of findings to be made. They describe their argument as being rather that "DNR . . . failed to make the public health findings required by the statute, not [that] DNR did not make enough findings."[6]

---

[6]This characterization of their argument varies substantially from the allegation in the complaint that "DNR has exceeded its statutory authority by limiting emissions from 405 substances without a specific finding for each substance that the limitation imposed is necessary to adequately protect public health or welfare. Instead, the DNR has abrogated its statutory responsibility to make specific findings in favor of a generic statement relating to the entire rule package." We nevertheless choose to treat the argument.

709

This argument requires us to employ a reasonable reading of DNR's finding to determine whether it satisfies the finding element in sec. 144.375(5)(b), Stats. Speaking through the Natural Resources Board, DNR found "that it is necessary to promulgate emission standards for hazardous air contaminants not regulated under section 112 of the federal Clean Air Act in order to provide adequate protection for public health and welfare." DNR stated that it "adopts the rule proposed . . . which establishes standards for hazardous air contaminants which are not currently regulated under section 112 of the federal Clean Air Act."

The only reasonable reading of its findings is that DNR found it necessary to promulgate the proposed emission standards for the 405 substances to provide adequate protection for public health or welfare. Section 144.375(5)(b), Stats., requires nothing more.

4. *Finding that Technology-Based Emission Standards are Necessary to Protect Public Health*

Plaintiffs assert that DNR "did not assess whether the emission standards it promulgated were necessary to protect public health."[7] They argue that DNR used two alternative processes which were not "health based," one of which was to employ technology-based controls for known or suspected carcinogens listed in Wis. Adm. Code sec. NR 445.04 Table 3. They assert that instead of meeting public health standards, DNR required industry to meet LAER or BACT standards which do not regu-

---

[7]We note in passing that this assertion is neither admitted by the defendants nor factually supported by plaintiffs' motion for summary judgment. It is probably partly based on the technology-based standards in the rule itself.

late emissions at levels required by public health. Technology-based standards, in plaintiffs' view, address only available technology and not whether such technology is required to protect public health.

Plaintiffs rely primarily upon *Natural Resources Defense Counsel v. U.S.E.P.A.,* 824 F.2d 1146 (D.C. Cir. 1987) (en banc) (*NRDC*). The *NRDC* court described the issue before it as whether the administrator of EPA had authority under the clean air act, 42 U.S.C. sec. 7412(b)(1)(B), to adopt an emission standard requiring emission reduction to the lowest level achievable by the use of BACT with respect to known carcinogens. *Id.* at 1147–48. The clean air act requires the administrator regulating hazardous pollutants to set emission standards "at the level which in his judgment provides an ample margin of safety to protect the public health." The court noted that "[c]urrent scientific knowledge does not permit a finding that there is a completely safe level of human exposure to carcinogenic agents." *Id.* at 1147. The court concluded that the mandate to provide an "ample margin of safety to protect the public health" requires the administrator to make an initial determination of what is "safe." *Id.* at 1163–64. The court concluded that the administrator could not consider cost and technological feasibility in determining what is "safe," and therefore the administrator lacked authority to adopt a rule based solely on those considerations. *Id.* at 1166.

Plaintiffs assert that the *NRDC* message is that an agency may not substitute a technology-based standard for a health standard in defiance of a statutory mandate. They conclude that DNR cannot consider technological feasibility in determining what is necessary to protect public health and welfare. They assert that the determination must be based solely on health needs, and only

711

after considering health may DNR consider cost and technology to set a standard that is "adequate" to protect public health. We disagree.

Whether DNR "assessed" the necessity of technological controls to protect public health pertains to the adequacy of the administrative record to support the rule. Nothing in sec. 144.375(5)(b), Stats., compels DNR to employ any particular emission standard, so long as the elements of that statute are met, or directs DNR how it must choose among emission standards which satisfy those elements. If the elements are satisfied, DNR is authorized to adopt the standard. Whether the record contains facts "which support the rule chosen by the agency to effectuate the governmental policy objective sought to be attained," as required by *Liberty Homes,* 136 Wis. 2d at 381, 401 N.W.2d at 811, is another matter. That issue has been removed from this lawsuit. It is not before us.

The challenge under consideration is that sec. 144.375(5)(b), Stats., does not authorize the rule. The rule matches the elements of sec. 144.375(5)(b). It creates an emission standard covering hazardous air contaminants. The technology-based standards limit the quantity, rate, and concentration of air contaminants on a continuous basis. DNR made the required finding. No showing has been made that an emission standard for any of the substances regulated by technology-based controls has been promulgated under the federal clean air act. Consequently, the department is expressly authorized by sec. 144.375(5)(b) to adopt the technology-based standard. Our analysis of the authority issue stops.

The *NRDC* holding does not bind us. The pertinent provision in the clean air act is substantially different

from sec. 144.375(5)(b), Stats. The requirement that the administrator of EPA set the emission standards "at the level which in his judgment provides an ample margin of safety to protect the public health" is narrower than the requirement in sec. 144.375(5)(b) that DNR find that "the standard is needed to provide adequate protection for public health or welfare." The federal act is restricted to "an ample margin of safety." Our law requires only "adequate protection." The federal law is limited to "safety." Our law permits DNR to adopt an emission standard to protect either health or welfare or both.

Nor did the *NRDC* court undertake the analysis required of us by *Liberty Homes,* 136 Wis. 2d at 373, 401 N.W.2d at 807, under which we first determine whether an issue involves constitutional considerations, statutory authorization, or rulemaking compliance. In the case before us, the issue regarding technology-based controls pertains to the factual basis for the rule, a due process challenge, or to the equal protection challenge, but not to DNR's authority.

5. *Extrapolation of Emission Standards from Threshold Limit Values DNR Did Not Develop*

For 329 of the regulated substances, DNR utilized lists of hazardous substances and corresponding standards compiled by others for other purposes and then extrapolated standards from those lists. To regulate outdoor air, DNR established one set of standards at 2.4% of the "threshold limit value—time weighted average" (TLV–TWA) for the applicable substances determined by the American Conference of Governmental Industrial Hygienists for indoor air. Appellants complain that rather than find that the threshold limit values could be converted to outdoor application, DNR "arbitrarily"

selected a 2.4% reduction factor without a finding of health need.[8] They argue that DNR has no statutory authority to make that selection.

Our analysis is the same as that we followed for appellants' challenge to technology-based standards. We need not repeat it in detail. The emission standard using a 2.4% reduction factor meets the statutory definition for an emission standard. DNR made the required finding with respect to the standard. All other elements of sec. 144.375(5)(b), Stats., have been satisfied. The rule is expressly authorized.

The true question is not whether DNR has the power to adopt a rule embracing an emission standard based on lists compiled by others, extrapolating standards from the list, and selecting a 2.4% reduction factor. It is rather whether the record made before DNR contains facts which support the rule to effectuate the governmental policy objective sought to be attained, a due process concern. *Liberty Homes,* 136 Wis. 2d at 381, 401 N.W.2d at 811. And that question is not before us.

### 6. *Partial Reliance on Negotiations when Extrapolating Emission Standards*

Appellants assert that DNR simply negotiated the reduction factor with industry. It negotiated upward from a 1% factor proposed by the DNR task force to the 2.4% factor in the adopted rule. They argue that negotiation is an impermissible method of arriving at an emis-

---

[8]The complaint alleges DNR "arbitrarily set a daily emission rate of 2.4% of the threshold limit values" and "arbitrarily set a one-hour emission rate of 10% of the TLVs" and "TLVs are inappropriate for setting" outdoor air standards.

sion standard.[9]

How the ultimate percentage was arrived at, by negotiation or otherwise, is not before us. The "negotiation" issue pertains to the factual basis for the rule. It has nothing to do with whether the elements of sec. 144.375(5)(b), Stats., have been satisfied.

### 7. DNR Regulation of Emissions from Sources Not Regulated by Clean Air Act

The interest of Wisconsin Petroleum Institute is limited to the regulation of benzene. The rule regulates benzene as a Table 3 substance, one without an acceptable ambient concentration and requiring the application of LAER. Wis. Adm. Code sec. NR 445.04 Table 3.

The institute argues that the rule is invalid as to benzene because the DNR exceeded the limited statutory authority granted to it under sec. 144.375(5)(b), Stats. That statute authorizes DNR to set emission standards for an air contaminant only if an emission standard for the contaminant has not been promulgated by the federal government under sec. 112 of the clean air act. EPA had adopted standards for certain benzene sources under sec. 112 before DNR regulated the substance. The institute concludes that the enabling statute on its face provides DNR with no authority to adopt a different benzene standard. We disagree.

We analyze the issue by matching the benzene regulation against the elements of sec. 144.375(5)(b), Stats. It is undisputed that benzene is a hazardous air contaminant. The DNR emission standard limits the quantity, rate, and concentration of benzene on a continuous basis. DNR made the required finding for all substances regulated by the rule. If no emission standard for ben-

[9]This claim is not pleaded in the complaint but we choose to dispose of it.

zene has been promulgated under sec. 112 of the federal clean air act, then the rule satisfies all elements of the enabling statute. We conclude that because the rule does not regulate sources of benzene emissions covered by emission standards promulgated under the federal clean air act, all elements of the enabling statute have been established.

The rule regulates hazardous air contaminant emissions in terms of their sources. The very first section in the rule is source-oriented. It states that "[t]his chapter applies to all air contaminant *sources* and to all owners or operators of an air contaminant *source.*" Wis. Adm. Code sec. NR 445.01(1) (emphasis added).

The enabling statute, sec. 144.375(5)(b), Stats., expressly authorizes DNR to promulgate rules limiting contaminant emissions from sources not regulated under the clean air act. This is true even though the statute does not use the word "source." Use of that word is unnecessary. The statute authorizes DNR to adopt "emission standards," and "[a]n emission . . . standard includes a requirement relating to the operation or maintenance of a *source* to assure continuous emission reduction." Sec. 144.30(11) (emphasis added).

Reading that definition into sec. 144.375(5)(b), Stats., the statute provides that if an emission standard relating to a *source* of a contaminant has not been promulgated under sec. 112 of the federal clean air act, DNR may promulgate such a standard if it makes the required statutory finding as to need. No other reading of the statute is reasonable. It is unambiguous, and we look no further for its meaning.

DNR's rule and the federal clean air act are compatible. Wisconsin Adm. Code ch. NR 445 applies "to all air contaminant sources and to all owners or operators of an air contaminant source" *except* "a source which must

meet a national emission standard for a hazardous air pollutant promulgated under section 112 of the federal clean air act for the specific air pollutant regulated under that standard." Sec. NR 445.01(1). The result is that all benzene emissions from sources regulated under the federal clean air act are excluded from the Wisconsin regulation.

Because we conclude that sec. 144.375(5)(b), Stats., expressly authorizes DNR to issue hazardous air contaminant emission limitations from sources not regulated by the clean air act, and the rule excludes sources regulated under the clean air act, our analysis stops. DNR has express authority to adopt the rule regulating benzene.

8. *Final Conclusion as to Motions for Summary Judgment on DNR's Authority to Adopt the Rule*

We conclude that the trial court properly denied the plaintiffs' motions for summary judgment to declare the rule invalid and granted defendants' motion to declare it valid insofar as the complaint asserts lack of statutory authority to adopt the rule. We therefore affirm that part of the order granting the defendants' motion for summary judgment and dismissing the claim that DNR lacks authority to adopt the rule. This disposes of the sole remaining challenge by all plaintiffs except the equal protection challenge brought by the hospitals, to which we now turn.

F. HOSPITALS' MOTION FOR SUMMARY JUDGMENT ON EQUAL PROTECTION GROUNDS

The hospitals challenge application to them of a single provision in the rule, Wis. Adm. Code sec. NR 445.05(5), which provides in relevant part:

> Any owner or operator of a stationary source on which construction or modification last commenced on or before October 1, 1988 and which combusts municipal solid waste . . . or infectious waste shall . . . control emissions of hazardous air contaminants listed in Table 3 of s. NR 445.04 to a level which is the lowest achievable emission rate . . ..[10]

The hospitals allege in the complaint that Wis. Adm. Code sec. NR 445.05(5) violates their right to equal protection of the laws. They allege that no rational basis exists for requiring them, as incinerators of infectious waste, (1) to use LAER rather than BACT for all Table 3 contaminants or (2) to control emissions of Table 3 contaminants even if their emissions are *de minimis*.

Equal protection analysis begins with determining whether the challenged rule creates a distinct class and treats its members significantly differently from all others similarly situated. *Milwaukee Brewers v. DH& SS,* 130 Wis. 2d 79, 90, 387 N.W.2d 254, 259 (1986). A classification created by an administrative agency is subject to equal protection challenge. *Robinson v. Florida,* 378 U.S. 153, 156 (1964).

---

[10]Municipal solid waste is "solid waste generated primarily by residential and commercial activities." Wis. Adm. Code sec. NR 500.03(86). Infectious waste is "solid waste which contains pathogens with sufficient virulence and quantity so that exposure to the waste by a susceptible host could result in an infectious disease." Sec. NR 500.03(67).

Wisconsin Adm. Code sec. NR 445.05(5) creates a distinct class consisting of owners or operators of infectious waste incinerators which emit Table 3 hazardous air contaminants.[11] The rule explicitly treats that class differently from other sources of Table 3 contaminants. The differences are significant. Incinerators of infectious waste must comply with sec. NR 445.05(5), whatever the amount of a Table 3 contaminant their incinerators emit. Members of the other class, all other sources emitting Table 3 contaminants,[12] need not comply unless they emit more than rule-established minimum amounts each year. Moreover, hospital incinerator sources must use LAER control for both Group A and B contaminants listed in Table 3. Other sources may use the less onerous BACT control for Group B contaminants.

The classification created by Wis. Adm. Code sec. NR 445.05(5) affects public welfare and economic concerns. For equal protection purposes, judicial review of such a classification is confined to whether a reasonable basis exists to justify it. *Matter of Care & Maintenance*

---

[11]Because no incinerator of municipal solid waste is a party, we discuss sec. NR 445.05(5) solely as it relates to infectious waste incinerators.

[12]The complaint so defines the other class. It may be significant that the hospitals do not define the other class as persons who incinerate noninfectious (or municipal) waste. We note in this connection that before sec. NR 445.05(5) was developed, the Natural Resources Board considered incinerators as a class unto itself. On January 28, 1988, the Board directed staff to develop programs to "limit the amount of toxic and hazardous materials in waste which is incinerated." It may have considered municipalities as a subclass, since it also directed staff to "develop a document for municipalities considering incineration of their solid waste." It issued no special instructions as to existing municipal incinerators or to hospital incinerators, existing or planned.

*of K.C.,* 142 Wis. 2d 906, 916, 420 N.W.2d 37, 40 (1988). Whatever justification exists for the classification depends on whatever facts exist special to infectious waste incinerator sources of Table 3 contaminants.

If the challenged classification had been created by statute, we would be obligated to locate or even construct, if possible, a rationale that might have influenced the legislature and would reasonably uphold the legislative choice. *Id.* If the constitutionality of the statutory classification depended on facts, we would presume the facts to exist unless they were shown not to exist. *Milwaukee Brewers,* 130 Wis. 2d at 99, 387 N.W.2d at 263.

For those reasons, if the classification were statutory, we could probably rely on the representations in defendants' brief that incinerated hospital waste is unusual. It is said to be high in kinds of plastics which when burned emit hydrochloric acid, chlorine, hydrogen chloride, cadmium, dioxins, furans, and other pollutants at levels which endanger public health. Perhaps we could accept the statement that DNR's not permitting hospitals to test for *de minimis* levels of Table 3 substances, but instead requiring them to use LAER controls for all Table 3 substances, not just known carcinogens, are expert judgment calls to which we should defer.

But here the challenge is to the constitutionality of an administrative rule. Consequently, it is not enough for counsel merely to provide us with a reasonable rationale justifying the classification. We cannot presume the existence of the facts on which such a justification depends. Because the justification depends on the facts, the *record* must disclose the facts on which a reasonable rationale may be based. *Liberty Homes,* 136 Wis. 2d at 384, 401 N.W.2d at 812. We "may rely only on facts *in the agency record or compiled at trial* to sustain agency

action." *Id.* (emphasis added). "The reviewing court must understand the nature of the issues confronting the agency and the evidence presented so as to assure itself that the agency rule is based, not on emotion or intuition, but rather *on reasonable and reliable evidence.*" *Id.* at 386-87, 401 N.W.2d at 813 (emphasis added).

The *Liberty Homes* court dealt with a due process challenge to an administrative rule and here the challenge is on equal protection grounds. The distinction is immaterial. The *Liberty Homes* court announced early in its opinion that it focused "on the methodology for courts to use in resolving constitutional challenges to the factual bases of administrative rules." *Id.* at 376, 401 N.W.2d at 809. The court developed a methodology to be applied in conjunction with any standard of review, whether the "arbitrary and capricious" test, the "rational basis" test, or the "substantial evidence" test. *Id.,* 401 N.W.2d at 808. Before the court could develop that methodology, it had to decide how the factual basis for a rule is determined, by presumption or otherwise. *Id.* at 382, 401 N.W.2d at 811. The court held that the factual basis must be in the record made before the agency or the trial court. *Id.* at 384, 401 N.W.2d at 812.

The appeal before us differs significantly from the appeal in *Liberty Homes.* The *Liberty Homes* court could review the full record presented to the agency and the facts the trial court received in evidence. *Id.* at 390, 401 N.W.2d at 814. That court could conclude from a complete review that facts of record supported the rule. *Id.* The appeal before us is from an order entered on summary judgment. We can review only such parts of the record made before DNR as the parties have chosen to give us. The trial court received no additional facts in evidence. We must therefore combine the methodology

developed in *Liberty Homes* and the methodology for summary judgment. The combination is awkward.

The *Liberty Homes* methodology requires the reviewing court first to determine the governmental objective the agency rule is intended to advance. Next, the court must make a searching and careful inquiry into the facts of record supporting the rule. It must understand the nature of the issues confronting the agency and the evidence presented to it. Finally, it must determine whether there is a rational connection between the facts of record and the agency's rulemaking choices. *Id.* at 386–87, 401 N.W.2d at 813.

■■■

Summary judgment methodology is based on sec. 802.08, Stats. Its purpose is to determine whether a trial is necessary. The judgment sought must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sec. 802.08(2).

Thus, if the hospitals are entitled to the summary judgment they seek, the reason will be that the factual record made before DNR provides no basis for the kind of rationale DNR tells us justifies the classification created by Wis. Adm. Code sec. NR 445.05(5). If DNR is entitled to the summary judgment it seeks, the reason will be that the factual record made before the agency provides that basis.

The hospitals' motion for summary judgment was properly denied. The motion falls short of meeting summary judgment requirements. The pleadings raise the equal protection issue but cannot supply the evidentiary facts required by sec. 802.08, Stats. *McCluskey v. Thranow,* 31 Wis. 2d 245, 253, 142 N.W.2d 787, 791 (1966).

No affidavit supports the motion.[13] It purports to "incorporate," so far as is material, the plaintiffs' brief in support of the motion and "the agency record." But statements of fact by counsel in briefs cannot substitute for the affidavits required by sec. 802.08(3). The attempt to "incorporate" the agency record was insufficient.

Although the resolution adopting Wis. Adm. Code ch. NR 445 recites that the Natural Resources Board "heard ample testimony," none has been made part of the appellate record. Only two items in the appellate record purport to include parts of the DNR record. Item 53 contains copies of thirty-three DNR documents consisting of board meeting minutes, letters, memoranda, and procedural materials. It does not purport to contain a record of the facts pertinent to hospital incinerators produced before DNR. Item 54 contains an "index of supplemental materials." It lists descriptions of thirty documents, none of which are part of the appellate record. It also contains a "hazardous emissions rule document inventory," a list of perhaps 900 documents. The documents themselves are not in the appellate record. Item 54 is not a record of the facts produced before DNR. Nothing in the appellate record tells us how any of the materials in Item 54 were used or interpreted.

---

[13]We are aware that an affidavit was attached to the hospitals' reply brief in support of their motion. It was signed but not notarized. We therefore ignore it. We infer that it probably was intended to be submitted to the trial court in opposition to DNR's motion. Trial briefs are seldom part of the appellate record. It is poor summary judgment practice to submit affidavits by attachment to trial briefs. The better practice is to attach supporting affidavits to the motion. Opposing or rebuttal affidavits should be filed as such with the clerk of court.

It is impossible to determine from the limited record before us that the factual record made before DNR provides no basis for a reasonable rationale justifying the disparate treatment of hospitals by Wis. Adm. Code sec. NR 445.05(5). More specifically, it is impossible for a reviewing court examining the record before us to conclude that it "understand[s] the nature of the issues confronting the agency and the evidence presented so as to assure itself [whether] the agency rule is based . . . on reasonable and reliable evidence." *Liberty Homes* at 386–87, 401 N.W.2d at 813. Accordingly, the trial court properly denied the hospitals' motion for summary judgment declaring Wis. Adm. Code sec. NR 445.05(5) to violate their right to equal protection of the laws. We turn to defendants' motion.

Defendants' motion seeks summary judgment declaring that the challenged rule is constitutional. Just as we cannot determine from the appellate record whether the DNR record contains no basis for the different treatment of hospitals, we cannot determine that it does.[14]

---

[14]We note that Item 53 of the appellate record contains a report to DNR on December 16, 1987—about five months before DNR adopted the rule—that "not enough data are available . . . to reach a conclusion regarding incineration of pathological wastes." R.53 at 519. DNR refers us to a report in Item 53 dated July 1987. It concluded only that hospital incinerators have the potential to emit benzene and that "strict regulation of combustion parameters or after-burners would be necessary." R.53 at 315. The executive summary of that report states that "[i]ncinerators and facilities in the chemical and allied products industry have greater potential to cause problems than most other manufacturing facilities." R.53 at 743. The summary does not distinguish hospital incinerators from others.

Defendants' motion is, however, also based on an affidavit by James Rickun. He states he chaired the Hazardous Emissions Task Force which developed the framework for Wis. Adm. Code ch. NR 445 and was the staff person primarily responsible for development and drafting of the rule.

Mr. Rickun states that the task force members relied on lists of compounds developed by various institutes and federal agencies. Those agencies developed lists of hazardous and carcinogenic compounds based on the best scientific data available. He furnished three examples of those lists. One is a booklet entitled "Threshold Limit Values and Biological Exposure Indices 1987–1988," printed by the American Conference of Governmental Industrial Hygienists. As far as we can determine, it provides no factual basis for the disparate treatment afforded to the hospitals. The report's 114 pages contain no references to hospitals or infectious waste. The second example is nothing more than a list of monographs by the International Agency for Research on Cancer. A list of monographs provides no factual basis for the disparate treatment. The listed monographs themselves are not attached.

Mr. Rickun's third example list of compounds is a volume entitled *Fourth Annual Report on Carcinogens (Summary 1985),* prepared by the United States Department of Health and Human Services. According to a footnote to Wis. Adm. Code sec. NR 445.04 Table 3, the list of Group A and Group B contaminants was taken from that report. However, we are not referred to specific facts in the report, and we are unable to find anything in it justifying stricter treatment of hospitals than of other sources of Table 3 contaminants. On the contrary, the few pertinent statements in the report with reference to a contaminant listed in Table 3 is that "its

occurrence in hospital wastes may give rise to a slight [or small] pollution problem." This is said as to adramycin, azathioprine, bischloroethyl nitrosourea, 1,4-butanediol dimethylsulfonate (myleran), various drugs used in certain combined chemotherapy for lymphomas (such as procarbazine and nitrogen mustard), 1-(2-chloroethyl)-3-cyclohexyl-1-nitrosourea, and dacarbazine. Table 3 includes, for example, ethylene thiourea, but the report makes no reference to its use or disposal by hospitals. The report refers to another substance included in Table 3, 2,3,7,8-tetrachlorodibenzo-p-dioxin as a "very toxic chemical [that] has no reported use other than as a test chemical in basic research." It asserts that amounts of this chemical have been detected "in the effluence from commercial incineration units." The report does not refer to hospitals in connection with this chemical and provides no special facts applicable to hospitals.[15]

With specific reference to the hospitals' challenge, Mr. Rickun states,

> He is aware from his attendance at Board meetings and his review of minutes that the Board dealt with the issue of incineration of municipal waste and infectious waste on several occasions, independent of the hazardous air contaminant rule. For example, on January 28, 1988, the Natural Resources Board adopted a resolution directing staff to continue to develop administrative rules specifically requiring the use of the most effective air pollution control tech-

---

[15]If we have misinterpreted or given insufficient weight to the cited report, the fault is defendants'. Judges are not scientists. They need tutoring. It is the task of counsel for an agency whose rule is attacked to make sure that staff provides the tutoring in a succinct but intelligible form, referring the judges always to the facts on which the agency relied and showing the judges where those facts appear in the record.

nology and improved incinerator design and opera-
tion standards, in order to minimize air emissions
from incinerators . . .. He directed his staff to com-
pile a list of the reference materials which were the
basis for the Department's concerns about air emis-
sions from incinerators of municipal waste and infec-
tious waste. That list . . . includes several reports
and studies identifying the hazardous air contami-
nants emitted by incinerators of municipal waste or
infectious waste. Examples of those reports and stud-
ies are attached.

The list attached to which Mr. Rickun refers briefly
describes four publications labelled as "Primary Materi-
als on Infectious Waste Incinerators." The first is an
article on the problem of hospital waste incineration in
Alberta, Canada. The second is a Michigan DNR report
to the effect that hospital incinerators emit pollutants
injurious to health. The third is by the chair of the Air
Pollution Control Association to the effect that hospital
incinerators are troublesome because of the high content
of plastics in their waste, but "the application of BACT,
similar to that for hazardous waste incinerators, can
effectively control hospital waste incinerator emission."
The fourth is a Michigan DNR decision about a particu-
lar hospital. The list describes five publications as "Sec-
ondary Materials on Infectious Waste Incinerators."
Like the "primary" materials, nothing in the summaries
of the secondary materials justifies disparate treatment
of hospitals.

Mr. Rickun also attaches to his affidavit a report by
a scientist with the United States Environmental Pro-
tection Agency for Region V entitled "Summary of Hos-
pital Incineration Information." It pertains to emissions
from hospital incinerators in the southeast Chicago area.
It contains two references to dioxins and furans. One is

to the effect that nonhazardous waste may be converted, during treatment and disposal operations, to hazardous products such as acid gases, dioxins, and furans. The second states that plastic packaging used for waste intended for incineration increases the probability of dioxin and furan formation. If DNR relies on this report as a factual basis for the special treatment of hospitals, we point out that Table 3 covers seventy-six contaminants, only one of which is recognizable as a dioxin and none of which have been identified to us as a furan.

We cannot determine from the materials submitted to support DNR's motion for summary judgment whether an adequate factual basis exists for the different treatment of hospitals by Wis. Adm. Code sec. HSS 445.05(5). For that reason, the trial court should have denied DNR's motion for summary judgment on that claim.

### G. CONCLUSION

Wisconsin Adm. Code ch. NR 445 does not exceed DNR's statutory rule-making authority. The trial court properly granted summary judgment to defendants as to plaintiffs' statutory authority claim. We affirm that portion of the order dismissing that claim.

The materials submitted on the cross-motions for summary judgment as to the hospitals' equal protection claim permit summary judgment for neither side. The trial court should not have granted summary judgment to defendants on that claim. We reverse the order insofar as it dismisses the equal protection claim and declares the rule to be valid in all respects.

The only plaintiffs remaining in the action are Wisconsin Hospital Association and Shawano Community

Hospital. On remand, they may try their equal protection claim against defendants.

*By the Court.*—Order reversed in part and affirmed in part and cause remanded for further proceedings.