WISCONSIN CITIZENS CONCERNED FOR CRANES AND
DOVES, John Wieneke and Pat Fisher, Plaintiffs-
Respondents-Petitioners,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
Defendant-Appellant,

U.S. SPORTSMEN'S ALLIANCE FOUNDATION f/k/a Wildlife
Legislative Fund of America, Defendant-
Intervenor-Co-Appellant.

Supreme Court

*No. 02–1166. Oral argument January 15, 2004.—
Decided April 6, 2004.*

2004 WI 40

(Also reported in 677 N.W.2d 612.)

323

For the plaintiffs-respondents-petitioners there were briefs by *George B. Strother, IV* and *Krekeler Strother, S.C.,* Madison, and oral argument by *George B. Strother, IV.*

For the defendant-appellant the cause was argued by *Philip Peterson,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

For the defendant-intervenor-co-appellant there was a brief by *Beth Ermatinger Hanan* and *Reinhart, Boerner, VanDeuren, S.C.,* Milwaukee, and *William P. Horn, Gretchen L. Gaston* and *Birch, Horton, Bittner and Cherot,* Washington, D.C., and oral argument by *Beth Ermatinger Hanan.*

I

¶ 1. JON P. WILCOX, J. This case is an appeal of a published court of appeals decision, *Wisconsin Citizens Concerned for Cranes and Doves v. DNR,* 2003 WI App 76, 263 Wis. 2d 370, 661 N.W.2d 858, reversing an order of the Dane County Circuit Court, Daniel R. Moeser, Judge, which declared Wis. Admin. Code § NR 10.01(1)(h) (Sept., 2000)[1] invalid and enjoined the Department of Natural Resources (DNR) from promulgating a rule authorizing a hunting season for mourning doves in Wisconsin.

¶ 2. The issue on appeal is whether the legislature has granted the DNR authority to set an open season for mourning doves. We have also asked the parties to

---

[1] The dove hunting rule first appeared in the Wisconsin Administrative Code in September of 2000. Wis. Admin. Code § NR 10.01(1)(h) (Sept., 2000). It took effect May 1, 2001.

address what impact, if any, the recently adopted "Right to Hunt" amendment to the Wisconsin Constitution has on the outcome of this case. Wis. Const. art. I, § 26. For the reasons discussed below, we affirm the court of appeals' decision. We hold that the DNR has express authority under Wis. Stat. § 29.014(1) (1999–2000)[2] to adopt § NR 10.01(1)(h) because the legislature has granted broad authority to the DNR to set open and closed seasons for "game" under § 29.014(1) and mourning doves fall within the unambiguous definition of "game" contained therein.

## II

¶ 3. The facts of this case are few and undisputed. On May 1, 2001, pursuant to § 29.014(1), the DNR adopted § NR 10.01(1)(h), which established an open season for mourning doves in Wisconsin from September 1 through October 30 and set daily bag and possession limits.[3] On June 19, 2001, Wisconsin Citizens Concerned for Cranes and Doves, John Wieneke, and Pat Fisher (collectively "WCCCD") commenced an action under Wis. Stat. § 227.40, seeking a declaration that the DNR exceeded its authority in promulgating

[2] The DNR adopted the dove hunting rule on May 1, 2001. As discussed *infra*, by virtue of 2001 Wis. Act 56, which took effect in April of 2002, several changes were made to pertinent provisions of chapter 29 that are reflected in the 2001–02 version of the Wisconsin Statutes. *See* 2001 Wis. Act 56, §§ 19–20. Therefore, unless otherwise noted, all subsequent statutory references are to the 1999–2000 version.

[3] Pursuant to Wis. Stat. § 15.34, the Natural Resources Board supervises and directs the DNR. Technically, the Natural Resources Board adopted the dove hunting rule. However, for simplicity, this opinion will refer to the DNR, as the Natural Resources Board is not a party to this action.

the dove hunting rule and an injunction prohibiting the DNR from enforcing the rule. The U.S. Sportsmen's Alliance Foundation (Alliance) intervened on behalf of the DNR.[4]

¶ 4. On April 16, 2002, the circuit court granted WCCCD's request for declaratory and injunctive relief, concluding that § 29.014(1) is ambiguous and that the legislature has not clearly authorized the DNR to set a hunting season for mourning doves, a "nongame species" regulated under Wis. Stat. § 29.039(1). In a split decision, the court of appeals reversed, concluding that § 29.014(1) is unambiguous and expressly authorizes the DNR to establish a hunting season for mourning doves because they are "game" within the meaning of that subsection. *Wis. Citizens Concerned for Cranes and Doves,* 263 Wis. 2d 370, ¶ 19. The court of appeals also concluded that even if mourning doves are a "nongame species," § 29.039(1) permits the DNR to regulate when "nongame species" may be hunted. *Id.*

### III

¶ 5. The central issue in this case is the validity of § NR 10.01(1)(h).[5] A court may declare an administrative rule invalid "if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was promulgated without compliance with statutory rule-making procedures." Wis. Stat. § 227.40(4)(a). WCCCD alleges that § NR 10.01(1)(h) exceeds the statutory authority of the DNR.

---

[4] As the Alliance makes substantially the same arguments as the DNR in this case, the opinion shall refer to the two collectively as the DNR when discussing their positions.

[5] "Administrative rules enacted pursuant to statutory rule-making authority have the force and effect of law in Wisconsin." *Staples v. DHSS,* 115 Wis. 2d 363, 367, 340 N.W.2d 194 (1983).

¶ 6. The nature and scope of an agency's powers are issues of statutory interpretation. *GTE North Inc. v. PSC,* 176 Wis. 2d 559, 564, 500 N.W.2d 284 (1993). When interpreting a statute, our goal is to discern the intent of the legislature, which we derive primarily by looking at the plain meaning of the statute. *Kitten v. DWD,* 2002 WI 54, 252 Wis. 2d 561, ¶ 33, 644 N.W.2d 649. *See also, Columbus Park Hous. Corp. v. City of Kenosha,* 2003 WI 143, ¶ 10, 267 Wis. 2d 59, 671 N.W.2d 633. The language of a statute is read in the context in which it appears in relation to the entire statute so as to avoid an absurd result. *Landis v. Physicians Ins. Co. of Wis.,* 2001 WI 86, ¶ 16, 245 Wis. 2d 1, 628 N.W.2d 893. Words and phrases are generally accorded their common everyday meaning, while technical terms or legal terms of art are given their accepted legal or technical definitions. Wis. Stat. § 990.01(1). Words that are defined in the statute are given the definition that the legislature has provided. *Beard v. Lee Enters.,* 225 Wis. 2d 1, 23, 591 N.W.2d 156 (1999). "If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning." *Bruno v. Milwaukee,* 2003 WI 28, ¶ 20, 260 Wis. 2d 633, 660 N.W.2d 656. Thus, if the statute is unambiguous, we do not consult extrinsic sources such as legislative history to ascertain its meaning; we simply apply its plain meaning. *Lincoln Sav. Bank v. DOR,* 215 Wis. 2d 430, 441, 573 N.W.2d 522 (1998). *See also, UFE Inc. v. LIRC,* 201 Wis. 2d 274, 281–82, 548 N.W.2d 57 (1996).

¶ 7. A statute is not ambiguous merely because the parties disagree as to its meaning, or because the circuit court and court of appeals reached different

conclusions; rather, a statute is ambiguous when it is readily susceptible to two or more meanings by reasonably well-informed individuals. *Lincoln Sav. Bank,* 215 Wis. 2d at 441–42. The test for ambiguity therefore examines the language of the statute "to determine whether 'well-informed persons *should have* become confused,' that is, whether the statutory . . . language reasonably gives rise to different meanings." *Bruno,* 260 Wis. 2d 633, ¶ 21 (citation omitted) (emphasis in original). Only if the statute is ambiguous must we turn to extrinsic sources such as legislative history to aid our interpretation. *Seider v. O'Connell,* 2000 WI 76, ¶¶ 50–52, 236 Wis. 2d 211, 612 N.W.2d 659.

¶ 8. Thus, "[t]he well established tenets of the plain meaning rule preclude courts from resorting to legislative history to uncover ambiguities in a statute otherwise clear on its face." *State ex rel. Cramer v. Schwarz,* 2000 WI 86, ¶ 37, 236 Wis. 2d 473, 613 N.W.2d 591. Indeed, "[t]he plain meaning of a statute takes precedence over all extrinsic sources and rules of construction, including agency interpretations." *UFE,* 201 Wis. 2d at 282 n.2. However, when a statute's plain meaning unambiguously evinces the legislative intent, we may consult legislative history to support our reading of the plain meaning of the statute. *Columbus Park Hous. Corp.,* 267 Wis. 2d 59, ¶ 36. *See also Seider,* 236 Wis. 2d 211, ¶ 52.

¶ 9. The parties dispute whether WCCCD carries any burden in demonstrating the rule to be invalid and whether this court should give deference to the DNR's interpretation of the relevant statutes. The court of appeals concluded that while the standard of review is de novo, it could "benefit" from the interpretation of the DNR. *Wis. Citizens Concerned for Cranes and Doves,*

263 Wis. 2d 370, ¶ 5. The court of appeals also determined that WCCCD had the burden to convince the court that § NR 10.01(1)(h) was invalid. *Id.,* ¶ 6. The DNR argues that WCCCD should bear such a burden and that this court should accord great weight deference to its interpretation of its rule- making authority. WCCCD maintains that it bears no burden and that this court should give no weight to the DNR's interpretation.

¶ 10. We first address whether WCCCD has any burden in this matter. The court of appeals relied on *League of Wis. Municipalities v. DOC,* 2002 WI App 137, ¶ 10, 256 Wis. 2d 183, 647 N.W.2d 301, for the proposition that a party challenging an administrative rule bears the burden of convincing the court that the rule is invalid. *Wis. Citizens Concerned for Cranes and Doves,* 263 Wis. 2d 370, ¶ 6. The court in *League of Wis. Municipalities,* 256 Wis. 2d 183, ¶ 10, in turn, relied upon *Citizens' Utility Board v. PSC,* 211 Wis. 2d 537, 552–53, 565 N.W.2d 554 (Ct. App. 1997), for this proposition. However, *Citizens' Utility Board* applied this burden in the context of reviewing an agency's application of legal standard to a set of facts. *Id.* at 552–53. The present controversy involves the construction of a statute, which is a purely legal question, subject to de novo review. *Hutson v. State Pers. Comm'n,* 2003 WI 97, ¶ 31, 263 Wis. 2d 612, 665 N.W.2d 212. Unlike factual questions, or questions where legal issues are intertwined with factual determinations, neither party bears any

burden when the issue before this court is whether an administrative agency exceeded the scope of its powers in promulgating a rule.[6]

¶ 11. Next, we must determine whether this court owes any deference to the DNR's interpretation of § 29.014(1). This court has stated that we are not bound by an agency's decision that concerns the scope of its own power. *Wis. Envtl. Decade, Inc. v. PSC,* 81 Wis. 2d 344, 351, 260 N.W.2d 712 (1978). The court of appeals concluded that while it applied a de novo standard of review, it could "derive 'benefit' from the experience and analysis of an administrative agency which the legislature has empowered to administer a law it has enacted." *Wis. Citizens Concerned for Cranes and Doves,* 263 Wis. 2d 370, ¶ 5 (citing *Seider,* 236 Wis. 2d 211, ¶¶ 25–27). The DNR asks this court to go further and give "great weight" deference to its interpretation of its rule-making authority.

---

[6] Nor does the present case involve the constitutionality of an administrative rule. "[L]ike statutes enacted by the legislature, regulations adopted by administrative agencies 'carry a heavy presumption of constitutionality and the challenger has the burden of proving unconstitutionality beyond a reasonable doubt.' " *LeClair v. Natural Res. Bd.,* 168 Wis. 2d 227, 236, 483 N.W.2d 278 (Ct. App. 1992) (quoting *Skow v. Goodrich,* 162 Wis. 2d 448, 450, 469 N.W.2d 888 (Ct. App. 1991)).

One commentator has described this difference as follows:

> While a constitutional challenge entails presumptions and burdens in support of the rule, a statutory authority challenge favors the challenger. The principle is that where no explicit authorizing statute exists, any reasonable doubt of the existence of implied power in an agency is resolved against its existence.

Steve Levine, *How to Review an Administrative Rule,* Wisconsin Bar Bulletin 56, Oct. 1983, at 40, 42.

¶ 12. Our decision in *Seider* cannot be read as according any level of deference to an administrative agency when the question before the court is whether the agency exceeded its authority. When we stated that we may "benefit" from an agency's analysis in *Seider,* 236 Wis. 2d 211, ¶ 27, we meant the same thing as when we declare that we benefit from the analyses of the circuit court and court of appeals when deciding questions of law. *See id.* In both cases, we mean only that while we apply a de novo standard of review, it is useful to have before us the analysis of another learned body concerning the issue presented.

¶ 13. In *Seider,* we clearly stated that we apply a de novo standard in " 'exceeds statutory authority' cases under Wis. Stat. § 227.40(4)(a)." *Seider,* 236 Wis. 2d 211, ¶ 25.[7] Therefore, we will not defer to an agency's interpretation on questions concerning the scope of the agency's power.[8] In addition, we need not defer to the

---

[7] We articulated the basis of this rule as follows:

> Independent review is the appropriate standard in these circumstances because it preserves the ultimate authority of the judiciary to determine questions of law, seeking to discern and fulfill the intent of the legislature. Our first duty is to the legislature, not the agency. . . . Even if we accorded the agency that promulgated a rule great weight deference, we would not uphold a rule that directly contravenes the words of a statute.

*Seider v. O'Connell,* 2000 WI 76, ¶ 26, 236 Wis. 2d 211, 612 N.W.2d 659 (internal citations omitted).

[8] *Grafft v. DNR,* 2000 WI App 187, ¶ 4, 238 Wis. 2d 750, 618 N.W.2d 897 ("Where, as here, we are construing a statute involving the scope of an agency's power, we give no deference to the agency's opinion, but rather, interpret the statute de novo."); *Amsoil, Inc. v. LIRC,* 173 Wis. 2d 154, 165, 496 N.W.2d 150 (Ct. App. 1992) ("Because this is a novel issue that involves

interpretations of the circuit court or court of appeals on such matters. *GTE North,* 176 Wis. 2d at 564.[9]

IV

¶ 14. In determining whether an administrative agency exceeded the scope of its authority in promulgating a rule, we must examine the enabling statute to ascertain whether the statute grants express or implied authorization for the rule. *Wis. Hosp. Ass'n v. Natural Res. Bd.,* 156 Wis. 2d 688, 705, 457 N.W.2d 879 (Ct. App. 1990). It is axiomatic that because the legislature

---

an agency defining its own power, we owe no deference to LIRC's interpretation of its power . . . ."); *State ex rel. St. Michael's Evangelical Lutheran Church v. DOA,* 137 Wis. 2d 326, 335, 404 N.W.2d 114 (Ct. App. 1987) ("[W]e agree, that [the circuit court] owed no deference to the agency's construction of the statute, since the statute affects the power of the agency to proceed.") (citing *Wis. Envtl. Decade, Inc. v. PSC,* 81 Wis. 2d 344, 351, 260 N.W.2d 712 (1978)).

The cases cited by the DNR that give great weight deference to an agency's interpretation of a statute are inapplicable. For instance, in *Trinwith v. LIRC,* 149 Wis. 2d 634, 640, 439 N.W.2d 581 (Ct. App. 1989), the court of appeals recited the familiar circumstances in which courts apply the "great weight" standard. However, the issue in *Trinwith* involved the application of a statute to a set of undisputed facts, not a question of an agency's power. *Id.*

[9] As one commentator has explained:

[M]ost challenges on the basis of lack of agency authority are questions of statutory construction—legal rather than factual issues. With no facts or factual presumptions to justify the rule, the issue becomes a legal one for the appellate court, not the agency and not the trial court.

Levine, *supra* at 42 (citing *Big Foot Country Club v. DOR,* 70 Wis. 2d 871, 875, 235 N.W.2d 696 (1975)).

creates administrative agencies as part of the executive branch, such agencies have "only those powers which are expressly conferred or which are necessarily implied by the statutes under which it operates." *Kimberly-Clark Corp. v. PSC,* 110 Wis. 2d 455, 461–62, 329 N.W.2d 143 (1983). *See also DOR v. Hogan,* 198 Wis. 2d 792, 816, 543 N.W.2d 825 (Ct. App. 1995). Therefore, an agency's enabling statute is to be strictly construed. *Id.* We resolve any reasonable doubt pertaining to an agency's implied powers against the agency. *Kimberly-Clark Corp.,* 110 Wis. 2d at 462. Wisconsin has adopted the "elemental" approach to determining the validity of an administrative rule, comparing the elements of the rule to the elements of the enabling statute, such that the statute need not supply every detail of the rule. *Wis. Hosp. Ass'n,* 156 Wis. 2d at 705–06 (citing *Kimberly-Clark Corp.,* 110 Wis. 2d at 461–62). If the rule matches the elements contained in the statute, then the statute expressly authorizes the rule. *Grafft v. DNR,* 2000 WI App 187, ¶ 7, 238 Wis. 2d 750, 618 N.W.2d 897. However, if an administrative rule conflicts with an unambiguous statute or a clear expression of legislative intent, the rule is invalid. *Seider,* 236 Wis. 2d 211, ¶¶ 72–73.

¶ 15. It is well established that "wild animals, including migratory birds, within the state, so far as it can be said such animals and birds are the subject of ownership, are owned by the state in its sovereign capacity in trust for the benefit of the people of the state[.]" *State v. Herwig,* 17 Wis. 2d 442, 446, 117 N.W.2d 335 (1962). Pursuant to Wis. Stat. § 227.11(2)(d), "an agency may promulgate rules implementing or interpreting a statute that it will enforce or

administer . . . ." The DNR claims authority under § 29.014(1) to promulgate the dove hunting rule.

¶ 16. Section 29.014(1) provides:

> The department shall establish and maintain open and closed seasons for fish and game and any bag limits, size limits, rest days and conditions governing the taking of fish and game that will conserve the fish and game supply and ensure the citizens of this state continued opportunities for good fishing, hunting and· trapping.

Wis. Stat. § 29.014(1).[10] As noted *supra,* § NR 10.01(1)(h) established an open season for mourning doves in Wisconsin from September 1 through October 30 and set daily bag and possession limits.

¶ 17. Following the "elemental" approach to agency authority explained *supra,* this case turns on whether mourning doves are "game" within the purview of § 29.014(1). Section 29.001(33) defines "game" as follows: " 'Game' includes all varieties of wild mammals or birds."[11] The DNR argues that mourning doves

---

[10] Wisconsin Stat. § 29.014(2)(b) provides that "[a]ll of the rules promulgated under this chapter are prima facie reasonable and lawful until found to be otherwise in a final determination by a court."

[11] Generally, the word "includes" is to be given an expansive meaning, indicating that which follows is but a part of the whole. *Milwaukee Gas Light Co. v. Dept. of Taxation,* 23 Wis. 2d 195, 203 & n.2, 127 N.W.2d 64 (1964). However, under the doctrine of *expressio unius est exclusio alterius*—"the expression of one thing excludes another"—courts may read "includes" as a term of limitation or enumeration, so that a statute encompasses only those provisions or exceptions specifically listed. *State v. Delaney,* 2003 WI 9, ¶ 22, 259 Wis. 2d 77, 658 N.W.2d 416. *See also State v. Engler,* 80 Wis. 2d 402, 408, 259 N.W.2d 97 (1977); *Harris v. Larson,* 64 Wis. 2d 521, 527, 219 N.W.2d 335

clearly fall within the unambiguous definition of the term "game" in § 29.001(33), such that § 29.014(1) confers authority on the DNR to sanction an open hunting season for mourning doves.

¶ 18. In contrast, WCCCD argues that the term "game" is ambiguous when it is considered within the entire context of chapter 29. Specifically, WCCCD argues that "game" is readily susceptible to more than one meaning when read in conjunction with the terms "game birds" and "nongame species."[12] WCCCD argues,

---

(1974). This rule may be applied only where there is some evidence that the legislature intended it to apply. *Pritchard v. Madison Metro. Sch. Dist.*, 2001 WI App 62, ¶ 13, 242 Wis. 2d 301, 625 N.W.2d 613. Here, many of the terms contained in Wis. Stat. § 29.001 are not defined by a general definition, but rather are defined by the use of the word "includes" followed by a list of certain species. *See, e.g.*, Wis. Stat. §§ 29.001(30)-(41). As discussed *infra*, the mourning doves were once on the list of "game birds" contained in § 29.001(39), but were later removed by the legislature. Had the legislature intended that the doctrine of *expressio unius est exclusio alterius* was not to apply, there would be no point in removing a single species from the definition of a term. Examining Wis. Stat. § 29.001 as a whole, we believe the legislature intended the narrow meaning of "includes," such that the doctrine of *expressio unius est exclusio alterius* is applicable.

[12] Wisconsin Stat. § 29.001(39) defines "game birds" as follows: " 'Game birds' includes wild geese, brant, wild ducks, wild swan, rails, coots, gallinules, snipe, woodcock, plovers, sandpipers, ruffed grouse, prairie chicken, sharp-tailed grouse, pheasants, Hungarian partridge, Chukar partridge, bobwhite, quail, crows and wild turkey." Wisconsin Stat. § 29.001(60) defines "nongame species" as follows: " 'Nongame species' means any species of wild animal not classified as a game fish, game animal, game bird or fur-bearing animal."

and the DNR concedes, that mourning doves are not "game birds," but do fall under the category "nongame species."[13]

¶ 19. WCCCD asserts that a reasonable mind could conclude that mourning doves cannot be "game" and at the same time not fall under the definition of "game birds," such that they are a "nongame species." Thus, utilizing various canons of statutory construction, WCCCD argues that the term "game" in § 29.014(1) encompasses only what it characterizes as the defined subcategories of "game birds," "game fish," or "game animals," such that under § 29.014(1), the DNR may authorize open seasons only for those defined subcategories and may not authorize the hunting of "nongame species." WCCCD claims that as "nongame species," mourning doves fall under the more specific statutory provision, Wis. Stat. § 29.039(1), which according to WCCCD, does not authorize the DNR to allow hunting of "nongame species."

---

[13] Pursuant to 2001 Wis. Act 56, § 19, Wis. Stat. § 29.001(39) (2001–02) currently defines "game birds" as follows: " 'Game birds' *means birds that are in the wild and* includes wild geese, brant, wild ducks, wild swan, rails, coots, gallinules, snipe, woodcock, plovers, sandpipers, ruffed grouse, prairie chicken, sharp-tailed grouse, pheasants, *gray* partridge, *chukar* partridge, bobwhite, quail, crows and wild turkey." (Emphasis indicates change from 1999–2000 version.) Likewise, pursuant to 2001 Wis. Act 56, § 20, Wisconsin Stat. § 29.001(60) (2001–02) now defines "nongame species" as follows: ' "Nongame species' means any species of wild animal *that is living in the wild and that is* not classified as a game fish, game animal, game bird or fur-bearing animal." (Emphasis indicates change from 1999–2000 version.) The parties have not briefed and therefore we do not discuss what impact, if any, these changes have on the present controversy.

¶ 20. WCCCD emphasizes that in 1971 the legislature designated the mourning dove as the state symbol of peace and removed mourning doves from the definition of "game birds." Ch. 129, Laws of 1971 (amending Wis. Stat. § 1.10 and Wis. Stat. § 29.01(3)(d)). WCCCD argues that this enactment indicates the intent of the legislature "that the symbol of peace not be subjected to destruction by the hunter's gun." Pet'r Br. at 26. WCCCD zealously proclaims:

> The mourning dove is an official state symbol that reflects a philosophical concept, the pursuit of peace, and which was recognized officially in the context of an acrimonious and unpopular war. That this state symbol represents such a philosophical concept differentiates and distinguishes the dove from various other state symbols, and supports the contention that the Legislature intended that this gentle bird be accorded special status.

Pet'r Br. at 27–28.

¶ 21. Despite WCCCD's impassioned argument, we find several flaws with its reasoning. First, the legislature has specifically chosen to provide a definition for the terms "game," "nongame species," and "game birds." "Game" is defined in § 29.001(33) to include "all varieties of wild mammals or birds." Mourning doves clearly fall within the definition of "game" that the legislature provided. The legislature has also specifically chosen to define the term "nongame species": " 'Nongame species' means any species of wild animal not classified as a game fish, game animal, game bird or fur-bearing animal." Wis. Stat. § 29.001(60). Mourning doves clearly fall within this definition as well because they are not "game birds," as defined in Wis. Stat. § 29.001(39). Wisconsin courts have long followed the

339

rule that "[w]here a word or phrase is specifically defined in a statute, its meaning is as defined in the statute, and no other rule of statutory construction need be applied." *Beard*, 225 Wis. 2d at 23 (citing *Fredricks v. Indus. Comm'n*, 4 Wis. 2d 519, 522, 91 N.W.2d 93 (1958)).[14] Therefore, the definition the legislature has provided for a term controls the plain meaning of that term in the statute. *State ex rel. Girouard v. Cir. Ct. for Jackson County*, 155 Wis. 2d 148, 156, 454 N.W.2d 792 (1990).

¶ 22. WCCCD's argument that mourning doves cannot logically be both "game" and a "nongame species" fails because it erroneously relies on the ordinary meaning of these terms and their supposed contextual ambiguity, ignoring the definition the legislature has specifically chosen to provide for those terms in chapter 29. *See id.* Notably, the legislature defined "nongame species" in relation to "game birds," specifically excluding the latter from the definition of the former. Wis. Stat. § 29.001(60). However, the legislature chose to define "game" broadly in § 29.001(33). WCCCD would essentially have us define "game" as "all varieties of wild mammals or birds *except those that have been designated as 'nongame species.'* " We decline to rewrite the statute in such a fashion, as the legislature did not define "game" and "nongame species" as mutually exclusive terms. The legislature could have defined "game" as composed of "game birds," "game fish," and "game animals," for purposes of § 29.014(1), but chose not to do

---

[14] *See also Republic Airlines, Inc. v. DOR*, 159 Wis. 2d 247, 253, 464 N.W.2d 62 (Ct. App. 1990); *Britton v. DOT*, 123 Wis. 2d 226, 229, 365 N.W.2d 919 (Ct. App. 1985).

so.[15] The provided legislative definition of "game" is clear and unambiguous: "all varieties of wild mammals or birds." The presence of the terms "nongame species" and "game birds" within chapter 29 does not render the term "game" ambiguous.

¶ 23. This court has previously recognized that the DNR has broad authority as custodian of Wisconsin's wildlife to enact regulations that maintain a balance between conserving and exploiting the state's wildlife. *Barnes v. DNR,* 184 Wis. 2d 645, 660, 516 N.W.2d 730 (1994).[16] The legislature has expressly granted the DNR broad regulatory authority to "establish and maintain open and closed seasons for fish and game . . . and conditions governing the taking of fish

[15] *See* Wis. Stat. § 29.047(1)(a)2. (defining "game" for purposes of this subsection as "any wild animal, wild bird or game fish").

[16] The Legislative Council Note to 1997 Wis. Act 248, § 77 provides, in pertinent part:

> Note: Under s. 227.11(2), state agencies are authorized to "promulgate rules interpreting the provisions of any statute enforced or administered by it . . . ." The DNR therefore clearly has authority to promulgate rules under all provisions of ch. 29, subject only to the specific limitations on its rule-making authority set forth in ch. 29 . . . .
>
> . . . .
>
> Note: One of the disadvantages, for the purposes of statutory interpretation, of individual examples of permissive rule-making authority, is the potential for an implication that by granting permissive rule-making authority for some provisions of ch. 29, the legislature did not intend to grant rule-making authority for other provisions of the chapter. This is clearly not the case, and such an implication would in fact be contrary to the legislature's broad grant of authority to the DNR under ch. 29 to regulate fish and game.

and game that will conserve the fish and game supply and ensure the citizens of this state continued opportunities for good fishing, hunting, and trapping." Wis. Stat. § 29.014(1).

¶ 24. The legislature did not limit that authority to set open seasons only for "game birds," "game fish," and "game animals" under § 29.014(1). Likewise, § 29.014(1) does not prohibit the DNR from authorizing an open season for "nongame species." Indeed, the only limitation upon the DNR's authority contained within § 29.014(1) is that any open season for "game" and the conditions therefor must conserve the game supply and provide continued opportunities for the citizens of this state to hunt. Regardless of the fact that mourning doves are no longer on the list of "game birds," § 29.014(1) does not refer to "game birds"; it refers to "game."

¶ 25. However, that does not mean that the DNR's authority to regulate "game" vis-à–vis birds is unfettered or unaffected by other provisions outside of § 29.014(1). As the DNR aptly notes, Wisconsin is subject to the restrictions contained in the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–711 (2000).[17] Further, the legislature may object to any proposed rule authorizing an open season of any given species pursuant to Wis. Stat. § 227.19. After a rule is promulgated, the

---

[17] A list of migratory birds protected by the Migratory Bird Treaty Act is contained in 50 C.F.R. § 10.13 (Oct., 2000). *See* 50 C.F.R. § 20.1 et seq. (providing specific regulations relating to the taking of migratory birds). The Wisconsin Administrative Code recognizes that migratory birds are protected under federal law and delineates certain actions that must be taken to implement an adequate protection program for migratory birds. Wis. Admin. Code § NR 1.12 (Apr., 2002).

legislature may suspend operation of the rule. Wis. Stat. § 227.26. Despite these limitations, we have found no provision in chapter 29 that prohibits the DNR from authorizing an open season under § 29.014(1) for "nongame species," much less mourning doves.

¶ 26. Further, the context in which the terms "game," "game birds," and "nongame species" are used in chapter 29 refutes WCCCD's arguments. An examination of the use of the terms "game birds" and "nongame species" within chapter 29 belies any argument that the term "game birds" is a specific and exclusive subcategory of "game" that are birds, or that "game" and "nongame species" are mutually exclusive terms.

¶ 27. Section 29.039(1) is the only substantive provision concerning "nongame species" contained in chapter 29. The term "nongame species" does not occur anywhere else in Wis. Stat. ch. 29. As discussed *infra*, § 29.039(1) relates to the conservation of "nongame species." There is no provision in chapter 29 that indicates a "nongame species" cannot nonetheless constitute "game."

¶ 28. Similarly, chapter 29 uses the term "game birds" in provisions that provide specific regulations governing those species listed as such. The first substantive occurrence of the term "game birds" is found in Wis. Stat. § 29.091, which concerns the taking of predatory game birds in a wildlife refuge. Wisconsin Stat. § 29.364(1) applies certain restrictions on the transportation of "game birds." *See also* Wis. Stat. § 29.741(2) (prohibiting taking plants that furnish food for game birds from the public waters); Wis. Stat. § 29.867 (providing for the establishment of and regulations pertaining to game bird farms); Wis. Stat. § 29.921(7) (empowering DNR wardens to kill dogs that destroy game birds). These provisions apply special protections to

"game birds" and limit certain activities with respect thereto. Again, there is no provision in chapter 29 that states a bird that is not listed as a "game bird" may not nonetheless constitute "game."

¶ 29. While it may seem odd, considering these terms in their normal, everyday usage, that a bird which is not a "game bird" may nevertheless be a bird that is "game," we are not applying the ordinary meaning of words. Rather, we are interpreting statutory provisions containing terms that the legislature has elected to define. While WCCCD's distinctions between "game," "game birds," and "nongame species" may be logical considering the ordinary meaning of these terms, we must utilize and apply the definitions the legislature has provided for these terms.

¶ 30. We conclude that the legislative scheme contained in Wis. Stat. ch. 29 uses the terms "game," "nongame species," and "game birds" at different times for different purposes, and does not demonstrate that the terms "game" and "nongame species" are mutually exclusive; nor does it indicate an intent to treat "game birds" as an exclusive subset of "game" in relation to birds that may be hunted.[18] Because the legislature has

---

[18] Moreover, chapter 29 explicitly contemplates that birds that are not "game birds" may be hunted. Wisconsin Stat. § 29.341 describes the duties of a hunter when an accidental shooting occurs, requiring:

> Any person who, *while hunting any wild animal or bird,* discharges a firearm or arrow, and by that discharge injures or kills another person, shall immediately give his or her name and address to the injured person, render assistance to the injured person and obtain immediate medical or hospital care for the injured person, and immediately report the injury or death to the sheriff or police of the locality in which the shooting took place.

provided a clear definition for the term "game" in chapter 29, that definition controls the plain meaning of that term in the statute. *Girouard,* 155 Wis. 2d at 156. The legislature defined "game" as "all varieties of wild mammals or birds." Wis. Stat. § 29.001(33). Mourning doves plainly fall within this definition. Neither the definition the legislature provided for the term "game" nor the context within which "game" is used throughout chapter 29 render its meaning ambiguous. Therefore, we conclude that mourning doves fall within the unambiguous definition of the term "game," such that the DNR has express authority under § 29.014(1) to adopt § NR 10.01(1)(h).

¶ 31. However, WCCCD argues that § 29.014(1) conflicts with § 29.039(1). Section 29.039(1) provides:

> The department may conduct investigations of nongame species to develop scientific information relating to population, distribution, habitat needs, and other biological data to determine necessary conservation measures. The department may develop conservation programs to ensure the perpetuation of nongame species. The department may require harvest information and may establish limitations *relating to taking, possession, transportation, processing and sale or offer for sale, of nongame species.*

Wis. Stat. § 29.039(1) (emphasis added).

¶ 32. WCCCD asserts that as a "nongame species," mourning doves are regulated under § 29.039(1), which is more specific than § 29.014(1), and therefore should control. *See Lindsey v. Lindsey,* 140 Wis. 2d 684, 693,

---

Wis. Stat. § 29.341 (emphasis added). The language "wild animal or bird" parallels the definition of "game." *See* Wis. Stat. § 29.001(33).

412 N.W.2d 132 (Ct. App. 1987). As § 29.039(1), according to WCCCD, does not permit the DNR to allow hunting of "nongame species," § 29.039(1) rather than § 29.014(1) should govern the existence of the DNR's authority in this case. The DNR counters that § 29.014(1) is the more specific statute because it specifically relates to hunting, whereas § 29.039(1) relates to conservation. In any event, the DNR argues that it is authorized to set seasons for "nongame species" under § 29.039(1), as that section specifically authorizes the DNR to establish limits for the "taking" of "nongame species." We need not determine which provision of chapter 29 is more specific because that principle of statutory construction applies only where the two statutes are in conflict. *State v. Maxey,* 2003 WI App 94, ¶ 22, 264 Wis. 2d 878, 663 N.W.2d 811. We conclude that the statutes are not in conflict because § 29.039(1) implicitly empowers the DNR to set open seasons for "nongame species."

¶ 33. Although section 29.039(1) does not *explicitly* empower the DNR to set open seasons for "nongame species," it may nonetheless *implicitly* empower the DNR to do so because § 29.039(1) permits the DNR to regulate the "taking" of "nongame species." Whether § 29.039(1) implicitly empowers the DNR to set seasons for "nongame species" depends on whether "taking" is synonymous as "hunting," such that the power to regulate "taking" would necessarily imply establishing regulations for "hunting." No definition for the word "taking" is provided in § 29.001. However, "taking" is included in the definition of "hunting" in Wis. Stat. · § 29.001(42), which provides that " 'hunt' or 'hunting' includes shooting, shooting at, pursuing, taking, capturing or killing or attempting to capture or kill any wild animal." Wis. Stat. § 29.001(42). The DNR argues

that "taking" is synonymous with "hunting," whereas WCCCD asserts that while "taking" may be part of the activities included in the definition of "hunting," "taking" is separate and distinct from such concepts as shooting or killing. WCCCD argues that "taking" merely means taking into possession, and that § 29.039(1) contemplates only taking a species into possession for the purposes of scientific study or conservation.

¶ 34. As the term "taking" is not specifically defined in chapter 29, we must resort to its common, ordinary meaning. Wis. Stat. § 990.01(1); *Weber v. Town of Saukville,* 209 Wis. 2d 214, 224, 562 N.W.2d 412 (1997).[19] The word "take" contains over 32 primary entries in the dictionary. More than one of these various definitions is arguably applicable to the statute. For example, entry 1.a. defines "take" as follows: "To capture physically; seize." *American Heritage Dictionary of the English Language* 1829 (3d ed. 1992). However, entry 1.c. defines "take" as follows: "To kill, snare, or trap (fish or game, for example)." *Id.* Therefore, the word "take" is reasonably susceptible to more than one meaning. As the legislature has not provided a defini-

---

[19] WCCCD directs our attention to Wis. Stat. § 169.01(34) (2001–02), which provides that " '[t]ake' means to capture, but does not include killing." Wisconsin Stat. ch. 169, relating to captive wildlife, was created by 2001 Wis. Act 56. *See* 2001 Wis. Act 56, § 224. We note, however, that this definition is specific to Wis. Stat. ch. 169. *See* Wis. Stat. § 169.01 (2001–2002). While the legislature may have chosen to define "take" in this fashion in chapter 169, it did not so define "take" in chapter 29. Furthermore, the inclusion of this definition of the word "take" in chapter 169 and the absence of such a definition in chapter 29 actually bolsters the DNR's position, as it is a strong indication that the term "take" in chapter 29 must have a different meaning than that term as it appears in chapter 169. *See State v. Welkos,* 14 Wis. 2d 186, 190, 192, 109 N.W.2d 889 (1961).

tion for the word "take" and its use in § 29.039(1) is ambiguous, we must resort to canons of construction to determine whether § 29.039(1) allows the DNR to set open seasons for "nongame species."

¶ 35. A cardinal rule of statutory interpretation is that statutes must be construed so as to avoid absurd results. *Seider,* 236 Wis. 2d 211, ¶ 32; *Wis. Hosp. Ass'n,* 156 Wis. 2d at 709. Also, when interpreting a statute, statutes governing similar subjects should be considered together, such that where a statute governing one subject contains a given provision, the omission of that same provision from a statute governing a related subject is evidence that a different intention existed. *State v. Welkos,* 14 Wis. 2d 186, 190, 192, 109 N.W.2d 889 (1961).[20]

¶ 36. First, we note that WCCCD's suggestion— that each of the delineated words contained in the definition of "hunt" must encompass separate and distinct concepts from the other terms, such that "taking" cannot mean the same as killing—would render absurd the meaning of the other terms enumerated in the definition of "hunting." If, for example, "taking" is conceptually distinct from "killing," then "shooting at" must be conceptually distinct from "shooting." Wis. Stat. § 29.001(42). Furthermore, if WCCCD's argument were correct, then "attempting to capture" a wild animal could not encompass "pursuing" a wild animal. Wis. Stat. § 29.001(42).

¶ 37. Second, the provision in chapter 29 empowering the DNR to set open and closed seasons uses the term "taking" and not "hunting": "The department

[20] *See also Kimberly-Clark Corp. v. PSC,* 110 Wis. 2d 455, 463, 329 N.W.2d 143 (1983) (*accord*).

shall establish and maintain open and closed seasons . . . and conditions governing the *taking* of fish and game . . . ." Wis. Stat. § 29.014(1) (emphasis added). If "taking" did not involve killing, trapping, or shooting, the DNR would be authorized to regulate the taking into physical possession of "game" but would not be authorized to regulate shooting, shooting at, trapping, pursuing or killing "game" within open and closed seasons. It would be absurd to construe the word "taking" as encompassing only the act of taking possession of "game" and not the concomitant acts of killing, shooting, shooting at, pursuing, or trapping "game."

¶ 38. Third, the portion of chapter 29 regulating endangered and threatened species provides: "No person may *take,* transport, possess, process or sell within this state any wild animal specified by the department's endangered and threatened species list." Wis. Stat. § 29.604(4)(a) (emphasis added). If the word "take" is given the construction the WCCCD suggests, then a resident of this state would be prohibited from taking an endangered or threatened species into possession, but would not be barred from shooting, shooting at, or killing an endangered or threatened species. This would constitute an absurd result and would defeat the entire purpose of the endangered and threatened species provision. *State ex rel. Cramer,* 236 Wis. 2d 473, ¶ 18 ("This court attempts to resolve any ambiguities in a manner that advances the legislature's purpose in enacting the statute.").

¶ 39. Several other provisions of chapter 29 would also be rendered nonsensical if "taking" did not include other activities contained within the definition of "hunting," such as killing or shooting. *See, e.g.,* Wis. Stat. § 29.091 ("The *taking* of predatory game birds and animals shall be done as the department directs.")

(emphasis added); Wis. Stat. § 29.192(4) ("If the department decides to limit the number of hunters or trappers *taking* Canada geese, sharp-tailed grouse, fishers, otters, bobcats or sturgeon by issuing permits . . . the department shall issue the permits . . . .") (emphasis added).

¶ 40. Thus, an analysis of the use of the word "take" in chapter 29 compels us to conclude that "take" or "taking" includes those activities delineated under the definition of "hunting" in § 29.001(42), such as killing, shooting, shooting at, trapping, and pursuing. This interpretation is consistent with the canon of construction *noscitur a sociis*—"it is known by its associates"—which provides that an unclear statutory term should be understood in the same sense as the words immediately surrounding or coupled with it. *See In re Estate of Nottingham v. Danielson,* 46 Wis. 2d 580, 589–90, 175 N.W.2d 640 (1970); *Black's Law Dictionary* 1084 (7th ed. 1999).[21] Under § 29.039(1), the DNR is authorized to regulate the "taking" of "nongame species."

¶ 41. However, WCCCD insists that the legislature intended to accord the same protection to "nongame species" as it did to endangered and threatened species. WCCCD directs our attention to chapter 370, Laws of 1977. This enactment created the specific statutory section relating to "nongame species." § 5, ch. 370, Laws of 1977. WCCCD notes that this law also

---

[21] *See also Citizens' Util. Bd. v. PSC,* 2003 WI App 206, ¶ 8, 267 Wis. 2d 414, 671 N.W.2d 11 (noting that "[u]nder *noscitur a sociis,* ordinarily the coupling of words denotes an intention that they be understood in the same general sense") (citing *State v. Johnson,* 171 Wis. 2d 175, 181, 491 N.W.2d 110 (Ct. App. 1992)).

created a specific fund for the conservation of nongame, endangered, and threatened species. § 1, ch. 370, Laws of 1977. WCCCD argues that this evinces a legislative intent to accord the same type of protection to these categories of species. However, given the fact that the legislature chose to create two separate and distinct regulatory schemes for "nongame species" and endangered or threatened species, § 29.039(1) and § 29.604 respectively, WCCCD's reliance on this budget enactment is dubious. While the legislature prohibited "taking" endangered or threatened species in § 29.604(4)(a), it failed to set forth a similar prohibition for "nongame species" and specifically empowered the DNR to regulate the "taking" of "nongame species" in § 29.039(1).

¶ 42. While WCCCD argues that mourning doves should be accorded the same protections as endangered or threatened species, mourning doves are not on the endangered or threatened species list. *See* Wis. Admin. Code § NR 27.03(1)-(2) (Nov., 2001).[22] As much as WCCCD would like them to be, the mourning doves are simply not listed as an endangered or threatened species.[23] Therefore, the prohibition against "taking" contained in § 29.604(4)(a) does not apply to mourning doves. We note that mourning doves were listed in Wis. Admin. Code § NR 10.02(5) (May, 2000) as a protected species, subject to the prohibition against "taking" con-

---

[22] The list of engendered or threatened species has not been amended since September 1999.

[23] Pursuant to Wis. Stat. § 29.604(3), the legislature has delegated authority to the DNR to establish a list of endangered and threatened species in Wisconsin. Whether a particular species appears on the endangered or threatened species list is subject to the DNR's discretion. *Barnes v. DNR,* 184 Wis. 2d 645, 662, 516 N.W.2d 730 (1994).

351

tained in that section, but were removed from this list the same time § NR 10.01(1)(h) was adopted. *See* Wis. Admin. Code § NR 10.02 (Sept., 2000).

¶ 43. Therefore, we conclude that there is no conflict between § 29.014(1) and § 29.039(1) relating to the DNR's authority over mourning doves. The power to authorize open seasons for the "taking" of "game" under § 29.014(1) is not inconsistent with the authority to ensure the conservation of a "nongame species" under § 29.039(1). Under § 29.014(1), the DNR may set open and closed seasons for "taking" mourning doves, as they constitute "game" for the purposes of that section. In addition, the DNR may conduct investigations, develop conservation programs, require harvest information, and limit the "taking" of mourning doves in order to ensure their perpetration because mourning doves are a "nongame species" for the purposes of § 29.039(1). These statutory sections are not inconsistent in relation to the DNR's authority over mourning doves. Indeed, at times it may be *necessary* to authorize the "taking of a "nongame species" if disease, overpopulation, or other factors jeopardize the perpetuation of the species.

¶ 44. Having determined that § 29.014(1) confers upon the DNR express authority to establish an open season for mourning doves, we next examine whether that authority is in any way affected by the newly enacted "Right to Hunt" amendment to the Wisconsin Constitution. Article I, Section 26 of the Wisconsin Constitution, as adopted by the citizens of this state in April of 2003, provides: "The people have the right to fish, hunt, trap, and take game subject only to reasonable restrictions as prescribed by law." Wis. Const. art. I, § 26. We interpret provisions of the Wisconsin Consti-

tution de novo, examining three primary sources to determine a provision's meaning:

> the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption.

*State v. Cole,* 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328 (quoting *Thompson v. Craney,* 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996)).

¶ 45. An examination of the plain language of Article I, Section 26 of the Wisconsin Constitution reveals that the 2003 constitution amendment was intended to codify the common law right to hunt that existed prior to its adoption. In *State v. Nergaard,* 124 Wis. 414, 420, 102 N.W. 889 (1905), this court declared that the citizens of the state have a common law right to hunt and fish game as they see fit in the absence of state regulations, so long as they do not infringe private rights. This court described the right as follows:

> [T]he state has the right, in the exercise of its police power, to make all reasonable regulations for the preservation of fish and game within its limits. It may ordain closed seasons; it may prescribe the manner of taking, the times of taking, and the amount to be taken within a given time, as it may deem best for the purpose of preserving and perpetuating the general stock. In the absence of legislation the citizen may doubtless pursue, take, and dispose of fish and game as he sees fit and without restraint, so long as he violates no private rights; but when the state steps in and makes proper police regulations, the citizen takes his right of fishing

or fowling hampered by such regulations; in other words, his right is the right which the state leaves to him, no more and no less.

*Id.*

■■■

¶ 46. The language of the 2003 constitutional amendment closely parallels the language in *Nergaard,* providing that the people of this state have the right to take game, subject to reasonable regulations. The 2003 amendment does not impose any limitation upon the power of the state or DNR to regulate hunting, other than that any restrictions on hunting must be reasonable. However, the WCCCD has not alleged that § NR 10.01(1)(h) is unreasonable. Therefore, the 2003 constitutional amendment does not affect our analysis of the DNR's authority in this case.

¶ 47. However, we do note that the fact that citizens of this state enjoy the right to hunt in the absence of reasonable regulations does not necessarily mean that it is "open season" on any species of birds not regulated by the DNR. Wisconsin Admin. Code § NR 10.02 currently provides that certain enumerated species are protected and may not be taken without authorization by the DNR. Specifically, Wis. Admin. Code § NR 10.02(8) (Nov., 2003) provides that "[a]ny other wild bird not specified in this chapter[ ]" may not be taken absent express authorization by the DNR. Therefore, under § NR 10.02(8), the DNR must engage in rule-making and expressly authorize the taking of any species of wild bird that is not currently regulated. If the DNR elects to do so, it is obviously restrained by its own rule-making procedures, federal law governing migratory birds, and federal and state law relating to endangered or threatened species.

## V

¶ 48. In summation, we hold that the DNR has express authority under § 29.014(1) to adopt § NR 10.01(1)(h) because the legislature has granted broad authority to the DNR to set open and closed seasons for "game" under § 29.014(1) and mourning doves fall within the unambiguous definition of "game" contained therein. We further hold that there is no conflict between § 29.014(1) and § 29.039(1) because mourning doves constitute "game" within the meaning of the former provision and qualify as a "nongame species" under the latter. Section 29.014(1) authorizes the DNR to set open season for the "taking" of "game," and § 29.039(1) empowers the DNR to set limits on the "taking" of "nongame species" to further the goal of conservation. The word "take" within relevant statutory provisions encompasses more than the act of mere possession and includes the other activities listed in § 29.001(42) under the definition of "hunting," including killing and shooting. Therefore, we conclude that the DNR had express authority under § 29.014(1) to adopt Wis. Admin. Code § NR 10.01(1)(h).

*By the Court.*—The decision of the court of appeals is affirmed.