STATE of Wisconsin, Plaintiff-Respondent,

v.

Sylvester HUGHES, Defendant-Appellant.†

Court of Appeals

*No. 97–0638–CR. Submitted on briefs February 3, 1998.—Decided April 7, 1998.*

(Also reported in 582 N.W.2d 49.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael H. Kopp* of *Kopp, Arena & Bishop, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Warren D. Weinstein,* assistant attorney general.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

SCHUDSON, J.  Sylvester Hughes appeals from the judgment of conviction, following his guilty plea, for theft from person, party to a crime, and from the order denying his motion for postconviction relief.[2] Hughes argues that the trial court erred in denying his motion to withdraw his guilty plea. He contends that the criminal complaint, used as the factual basis for his plea, failed to establish one of the elements of the crime. Specifically, he claims that the complaint's allegation that he took the victim's purse "off the handle of her wheelchair" does not satisfy the element of taking property "from the person." We conclude, however, that for the crime of theft from person, "from the person" does encompass the wheelchair in which the victim is sitting. Accordingly, we affirm.

When Hughes pled guilty to theft from person, party to a crime, the parties stipulated to the criminal complaint as the factual basis to support his plea. The relevant portions of the criminal complaint state: (1) that the victim stated that she was leaving a grocery store "in her wheelchair" when the perpetrator "approached her and took her purse and its contents off the handle of her wheelchair where it was hanging and fled"; and (2) that Hughes told police that he observed his accomplice take the purse "from the back of the wheelchair."[3] After sentencing, Hughes moved to with-

---

[2] In the same case, Hughes also was convicted of operating vehicle without owner's consent. On appeal, however, he does not challenge that conviction. At the same hearing, Hughes also pled no contest to burglary, charged in a separate complaint. He also does not challenge that conviction in this appeal.

[3] At the guilty plea and sentencing hearings, there was some dispute regarding whether Hughes or his accomplice did the actual taking. Hughes, however, did not dispute his liability as party to the crime.

draw his guilty plea, contending that the plea hearing did not establish the required factual basis for acceptance of his plea.

Denying Hughes's postconviction motion, the trial court, in a scholarly written decision, concluded that Wisconsin's theft from person statute "is broad enough to encompass the taking of a purse under these circumstances . . . ." The trial court carefully traced the historical debate over what constitutes "from the person," noting that as early as 1897, the California Supreme Court struggled to resolve "whether the property must be actually on, or attached to, the person, or merely under the eye, or within the immediate reach, and so constructively within the control, of the owner." *People v. McElroy*, 48 P. 718, 718 (1897). The trial court considered case law in which courts had resolved that issue differently, some adopting what the trial court termed "a narrow view of the connection between victim and property,"[4] and others embracing "a broader standard."[5]

The trial court concluded that the "broader standard of connection" between the person and the property is appropriate because it "is consistent with a reasonable interpretation of the statutory language, is consistent with the purposes and policies behind the statute, and is supported by much of the case law from

---

[4] *See, e.g., People v. Williams*, 12 Cal. Rptr.2d 243, 247 (Ct. App. 1992) ("property taken from the actual and immediate control of the victim is not taken from 'the person' of the victim . . . unless the property is physically attached to the victim in some manner").

[5] *See, e.g., People v. Sumter*, 173 A.D.2d 659, 660 (N.Y. App. Div. 1991) (wallet taken from purse hanging over back of library chair in which victim was seated had "sufficient physical nexus" to victim to establish theft from person).

other jurisdictions." The trial court explained that "[w]hile any standard inevitably leaves some area of uncertainty, a broader standard avoids the absurd results which follow from any attempt to define an area of strict physical attachment." With reference to the specific facts of this case, we agree. Therefore, without commenting on any number of other factual scenarios that may emerge, we conclude that under Wisconsin's theft from person statute, "from the person" does encompass the taking of property from the wheelchair in which the victim is sitting at the time of the taking.

Subsections 943.20(1)(a) and (3)(d)2, STATS., provide that "[w]hoever . . . [i]ntentionally takes and carries away . . . movable property . . . from the person of another" is guilty of theft from person.[6] The supreme court recently clarified:

---

[6] Section 943.20, STATS., states, in pertinent part:

**943.20. Theft. (1)** ACTS. Whoever does any of the following may be penalized as provided in sub. (3):

(a) Intentionally takes and carries away, uses, transfers, conceals, or retains possession of movable property of another without the other's consent and with intent to deprive the owner permanently of possession of such property.

The specific crime of theft from person is established through the penalty section of § 943.20, STATS., which, in subsection (3)(d)2, adds the element at issue in this appeal:

**(3)** PENALTIES. Whoever violates sub. (1):

. . . .

(d) If the value of the property does not exceed $2,500 and any of the following circumstances exist, is guilty of a Class D felony:

. . . .

2. The property is taken from the person of another or from a corpse[.]

> Withdrawal of a plea following sentencing is not allowed unless it is necessary to correct a manifest injustice. Historically, one type of manifest injustice is the failure of the trial court to establish a sufficient factual basis that the defendant committed the offense to which he or she pleads.

*State v. Smith*, 202 Wis. 2d 21, 25, 549 N.W.2d 232, 233–34 (1996) (citations omitted). Further, "[i]f there is no evidence as to one of the elements of the crime, . . . the factual basis requirement cannot be met." *Id.* at 26, 549 N.W.2d at 234. To determine whether the facts in this case satisfy the element of "from the person," we must interpret and apply § 943.20(3)(d)2, STATS. Interpretation and application of a statute present questions of law subject to our *de novo* review. *State v. Richer*, 174 Wis. 2d 231, 238–39, 496 N.W.2d 66, 68 (1993).

█

Hughes first argues that the statute is "clear on its face," and that "person" cannot encompass a victim's wheelchair. He concedes, however, that no "reported decision in Wisconsin . . . has specifically addressed the issue of whether the property must be taken 'from the person' or whether it is sufficient that property merely be 'near the person' or in the person's 'immediate pres-

---

As the State has noted, although the requirements of subsection (3) are not elements of theft in a technical sense, they do establish the additional factor that constitutes a theft from person for the purpose of determining the applicable penalty. *See State v. Kennedy*, 105 Wis. 2d 625, 636, 314 N.W.2d 884, 889 (Ct. App. 1981); *see also State v. McNearney*, 175 Wis. 2d 485, 489 n.2, 501 N.W.2d 461, 463 n.2 (Ct. App. 1993). This technical distinction makes no difference in this appeal; accordingly, we discuss "from the person" under § 943.20(3)(d)2, STATS., as an "element."

ence,' in order to constitute theft from person." Hughes's concession is correct and all but erases his contention that "from the person" is unambiguous. Indeed, although the substantial disagreement in the many cases both parties cite does not absolutely establish the statute's ambiguity, it certainly suggests that reasonably well-informed persons do reach different interpretations of "from the person." *See Lincoln Sav. Bank, S.A. v. DOR*, 215 Wis. 2d 430, 452, 573 N.W.2d 522, 531 (1998) (Abrahamson, C.J., concurring). ("[W]hen courts or judges disagree about the interpretation of a law, the law is, by definition, capable of being understood in two or more different senses by reasonably well-informed persons . . . ."). We conclude that "from the person" is ambiguous.

Hughes argues that if the statute is ambiguous, then WIS J I—CRIMINAL 1442 supports his narrow interpretation of "from the person." He quotes the instruction's specification that the element "requires that the property must have been taken from the body of the person in possession of the property." As the State points out, however, the Comment to the instruction offers no authority to support the notion that "person" is limited to the "body" of the person. Moreover, we note that "body" is not necessarily any more definite than "person" and, interpreted literally, could carry countless offenses outside the parameters of theft from person simply because the property was not directly touching the victim's flesh. Thus, in this case, we gain little insight from the instruction. *See State v. Olson*, 175 Wis. 2d 628, 642 n.10, 498 N.W.2d 661, 667 n.10 (1993) (jury instructions merely persuasive, not precedential).

The State, relying on the legislative history of § 943.20, STATS., argues that public policy requires a

broad interpretation of "person." That history does not definitively resolve the larger debate between "narrow" and "broad" interpretations of "from the person." It does, however, support the State's view that, in the words of the 1953 Legislative Comment to the theft from persons and corpses statute, enhanced penalties were deemed appropriate "[b]ecause they covered circumstances which made stealing particularly dangerous or undesirable . . . ." Laws of 1953, ch. 623, §§ 281–82.[7] Consistent with that concept, we have no

---

[7] The legislative history is somewhat complicated. As summarized, in part, by the State in its brief to this court:

> Wisconsin's criminal code underwent a complete revision beginning in 1950. Prior to this revision, larceny from the person was contained in a separate section, sec. 343.15 (1949). After the 1949 session of the legislature, the Legislative Council initiated the revision of the criminal code. Platz, *The Criminal Code*, 1956 Wis. L. Rev. 350. The original recommendation, including the property crimes, was introduced in the legislature as Senate Bill 784.
>
> Senate Bill 784 passed the Senate, but not the Assembly, and the whole matter was remanded to the Legislative Council for further study and completion. Platz, *The Criminal Code*, 1956 Wis. L. Rev. at 351. Between 1951 and 1953, the Judiciary Committee and others extensively studied and produced a complete criminal code. In 1953, Assembly Bill 100A was introduced. After much political maneuvering, Assembly Bill 100A passed both houses, although it died for lack of a required reenactment inserted as a compromise to secure its passage. Platz, *The Criminal Code*, 1956 Wis. L. Rev. at 352–53. In 1955, a new code was adopted which resulted in the language of the present sec. 943.20. The 1955 code did not have comments, but the Legislative Comments of . . . 1953 provide insight into the statutory language contained in sec. 943.20.
>
> . . . .
>
> The Legislative Comments of 1953 indicated that the old larceny from persons and corpses, together with the looting statute, provided enhanced penalties "[b]ecause they covered circumstances which made stealing particularly dangerous or undesirable . . . ." Legislative Comments 1953 at page 114. The committee indicated: "[T]he penalty in the new section is aggravated . . . under

hesitation in concluding that the taking of property from the wheelchair in which the victim is sitting is "particularly dangerous [and] undesirable," and that it constitutes theft from person.[8]

Understandably, the parties and the trial court considered voluminous case law from Wisconsin and other jurisdictions, searching for circumstances comparable to those of the instant case. In the process, they examined theft from person cases involving takings from pockets, purses, park benches, car seats, shopping carts, and a variety of other locations in close proximity to the "body" or "person" of the victim. Were these more or less like the instant case? Could we reach any certain conclusion given that the cases reached such different conclusions?

Studying these cases and others, we come to an understanding neither party has proposed—an understanding that need not endorse either a narrow or broad interpretation beyond the facts of this case. Indeed, trying to apply any of the many conflicting cases involving non-wheelchair locations to this case would be like trying to pound the proverbial square peg

> the same circumstances." Legislative Comment 1953 at 114[; *see* Laws of 1953, ch. 623, §§ 281–82].

(Footnotes omitted.)

Having examined the sources on which the State's summary of the legislative history relies, we reach essentially the same conclusion: the legislative history indicates the legislature's intent to enact a theft from person statute that enhances the penalty for takings that are "particularly dangerous or undesirable."

[8] In reaching this conclusion we do not foreclose the possibility that such conduct, depending on all the circumstances, could also constitute other crimes, including robbery, under § 943.32(1), STATS., and theft "from a vulnerable adult," under § 943.20(1)(a) and (3)(d)6, STATS.

into the round hole. We simply cannot escape the fact that, by virtue of the unique circumstances involving a theft of property hanging from the handle of a wheelchair in which the victim is sitting, case law considering thefts from other locations provides little if any guidance. Instead, with common sense, we consider the circumstances of a person in a wheelchair.

In recent years, citizens who use wheelchairs have demonstrated their capacity to live full lives and contribute immeasurably to our society. *Cf.* Robert L. Burgdorf, Jr., *"Equal Members of the Community": The Public Accommodations Provision of the Americans with Disabilities Act,* 64 TEMP. L. REV. 551 (1991) (discussing congressional hearings on ADA). To do so, they have required nothing more than the reasonable accommodation of the physical realities of their circumstances. Part of that accommodation has come through law, part through greater sensitivity of others, and part through technological advances, including wheelchair improvements. *See generally* Jonathan C. Drimmer, Comment, *Cripples, Overcomers, and Civil Rights: Tracing the Evolution of Federal Legislation and Social Policy for People with Disabilities,* 40 UCLA L. REV. 1341 (1993) (discussing disability discrimination and the legal system). As a result, many persons who use wheelchairs have gained the potential for greater mobility than ever before. Thus, wheelchairs have become essential extensions of their "persons," and wheelchair handles and storage compartments are, of course, essential to their wheelchair use.

Thieves who attempt to take advantage of a person's wheelchair circumstances do indeed commit the kind of "particularly dangerous [and] undesirable" crime the legislature logically would have had in mind had it considered a situation such as that of the instant

case. It would be absurd to think that one citizen, needing to hang a bag or a purse from a wheelchair handle so that he or she could move the wheels or operate the controls, has been any less victimized by the theft of that property than another citizen holding a bag or a purse in his or her hands, on the lap, or over a shoulder.

Accordingly, precisely because persons who use wheelchairs, and those who do not, deserve *equal* treatment and protection under the laws prohibiting theft,[9] we conclude that theft "from the person" encompasses the taking of property from the wheelchair of one sitting in the wheelchair at the time of the taking.[10]

---

[9] Harvard University Law Professor Martha Minow acknowledges the cynical view that accommodations for those who use wheelchairs, and legal interpretations regarding the status of persons of different circumstances generally, result in unfair, preferential treatment. She explains, however, that such accommodations and interpretations are more accurately viewed as ones that neither reduce nor threaten the rights of anyone, but rather, equalize and enhance the rights of all, and sometimes even produce surprising benefits:

> Shifting perspectives exposes how a "difference" depends on a relationship, a comparison drawn between people with reference to a norm. And making this reference point explicit opens up debate. Maybe the reference point itself should change. Employers do not have to treat pregnancy and parenthood as disabilities; instead, they could treat them as part of the lives of valued workers. It is possible to replace a norm that excludes with a norm that includes. Renovating the sidewalks to make them accessible to people in wheelchairs takes their needs as the norm but does not exclude others. Indeed, this renovation may yield unexpected benefits for people pushing baby strollers or riding bicycles.

MARTHA MINOW, MAKING ALL THE DIFFERENCE: INCLUSION, EXCLUSION, AND AMERICAN LAW 377 (1990).

[10] In this case, although we refrain from embracing either a narrow or broad standard that would necessarily apply to other

*By the Court.*—Judgment and order affirmed.

factual situations, we do not refrain from acknowledging two important implications that logically and ineluctably flow from our holding: (1) "wheelchair," as we have used the term in this decision, encompasses functional equivalents, including canes, crutches, walkers, motorized carts and other apparatuses serving the same purpose; and (2) "sitting in the wheelchair," as we have used the phrase in this decision, encompasses the times and locations involved in getting into or out of, or taking hold of or releasing, a "wheelchair" or its functional equivalent.