State of Wisconsin, Plaintiff-Respondent,

v.

Michael S. Hoseman, Defendant-Appellant.†

Court of Appeals

*No. 2010AP1362–CR. Submitted on briefs February 10, 2011.
—Decided May 11, 2011.*

2011 WI App 88

(Also reported in 799 N.W.2d 479.)

† Petition for Review dismissed 6/14/11.

415

416

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Timothy M. Johnson* of *McDermott, Foley, Johnson & Wilson, LLP*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James M. Freimuth*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Anderson, J.

¶ 1. ANDERSON, J. Seeking to escape responsibility for damages that rendered an 1885 Victorian home uninhabitable, Michael S. Hoseman appeals from a judgment of conviction in which the court included an

order that he pay a $25,000 portion of restitution totaling $106,409.63. Hoseman asserts that the manufacture of marijuana is a "victimless" crime; therefore, he reasons the owners of the residence are not "direct victims" of his criminal conduct. We reject Hoseman's argument and affirm that his unauthorized alterations to the residence in order to construct and operate a hydroponic growing operation were at the heart of the extensive damages that made the residence uninhabitable.

¶ 2. Along with four other individuals,[1] Hoseman was charged with a single count of conspiracy to manufacture between 2500 and 10,000 grams of marijuana contrary to Wis. Stat. §§ 961.41(1)(h)4. and 961.41(1x) (2009–10).[2] The charge arose after law enforcement uncovered a sophisticated marijuana growing operation in Walworth county.

¶ 3. The State and Hoseman reached a plea agreement under which Hoseman pled guilty to a lesser charge of conspiracy to manufacture between 200 and 1000 grams of marijuana in violation of Wis. Stat. §§ 961.41(1)(h)2. and 961.41(1x). The trial court imposed three years' initial confinement and three years' extended supervision. It also tentatively held Hoseman was jointly and severally liable for restitution of $106,409.63 in property damages.

BACKGROUND

¶ 4. The underlying facts are not in dispute. The growing operation was set up in an 1885 Victorian home owned by Tom and Lisa Burbey. Initially, the Burbeys had the house on the market for sale but

[1] Matthew J. Boyle, Lambertus M. Hendericks, John G. Olson, and Anthony J. Saporito, all from Chicago, Illinois.

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

without any potential buyers, they decided to rent out the house. Hoseman, posing as the son of co-conspirator John G. Olson, approached the Burbeys seeking to rent the house as a weekend retreat and represented that the long-range plan was to move to the house and purchase it from the Burbeys. After Tom Burbey finalized the lease, he moved to Las Vegas, Nevada, to join his wife.

¶ 5. Olson provided almost $180,000 in capital for the development of the hydroponic growing operation and Hoseman served as the on-scene architect. Two upstairs bedrooms were converted to grow rooms using nutrients from Canada; hydroponic growing equipment purchased from suppliers in California—including buckets, lights, ballasts, fertilizer and a growing medium. Starting with marijuana seeds from Amsterdam, the original fifty plants were cloned to produce 200 plants with a street value of $300,000 to $500,000. To prepare the two grow rooms, blankets covered all the windows and sheets were stapled to the walls to reflect the grow lights. Hoses and electrical wiring ran up the stairs. Fifty-gallon drums that held the nutrients and residual acids from the operation were drained into toilets and sinks. The exhaust gases from the growing operation were vented directly into the house. For security, closed circuit televisions were mounted in the house to provide coverage of the outside lot.

¶ 6. After not receiving rental payments from Hoseman for several months, Tom Burbey returned to Walworth county to begin an eviction action. Upon arriving at the house, he had to break in because the locks had been changed. After discovering the growing operation, Burbey notified law enforcement.

¶ 7. The Burbeys filed a restitution claim for property damage in the amount of $106,409.63. The damage they documented stated that high humidity

from the operation encouraged mold and mildew damage to the walls, fixtures, wood and curtains. The huge barrels of chemicals needed for the operation ruined wood floors, carpeting and an antique rug. There were hundreds of staple holes in the walls as the result of stapling reflective sheets. THC resin saturated many surfaces; there was testimony that the "[s]ticky sappy stuff doesn't wash off that sticks to your hands, it leaves your handprint on it when you touch it and smells like marijuana and stinks like marijuana and never goes away." Draining acidic chemicals into the toilets and sinks created stains; the toilets were also stopped up with plant material. Finally, the furnace was not working, resulting in frozen water pipes. In their claim for restitution, the Burbeys asserted that as a result of the damages, their residence was uninhabitable.

¶ 8. After sentencing, Hoseman and his co-conspirators filed a motion demanding an evidentiary hearing on the Burbeys' claim for restitution. When the hearing began, the co-conspirators objected to the court's authority to hear the claim for restitution, insisting that the Burbeys were not victims of a crime.

> Judge, first of all, in a drug case there—in fact, I had a sentencing before you last week where even the state asserted in a drug case there is no victim. Number one, if this were a burglary matter, sexual assault, homicide, something of that nature, then this person could claim to be a victim. This is a civil matter with civil damages, and they have not asserted in any way.

¶ 9. The Burbeys' attorney responded, the house "was not rented to operate a marijuana greenhouse. It was operated as a residential rental. It was a home. They used my clients' house, water, electricity, heat, all of the equipment, the fixtures, everything in my clients' house for that enterprise. That makes my client[s] [] victim[s]."

420

¶ 10. The trial court denied the motion, holding that the use of the Burbeys' house was a part of the conspiracy to manufacture marijuana. The court concluded that conducting the criminal enterprise in the Burbeys' house made them victims as defined in Wis. Stat. § 950.02(4)(a)1., entitling them to restitution under Wis. Stat. § 973.20. The court went on to conduct an evidentiary hearing that lasted over two days. At the conclusion of the hearing, the court determined that restitution damages totaled $106,409.63. It set Hoseman's restitution at $25,000, based on his ability to pay during the six-year term of his sentence. Hoseman appeals.

¶ 11. On appeal, Hoseman continues with his theme that the manufacture of marijuana is a "victimless" crime; specifically, he argues that the Burbeys are not victims under Wis. Stat. § 973.20 and are not allowed to receive restitution. He contends that the term "victim" as defined in the statutes is "a person against whom a crime has been committed" and does not include all of those who suffered pecuniary losses caused by a defendant's crime.

STANDARD OF REVIEW

¶ 12. The scope of the trial court's authority to order restitution is a question of statutory interpretation. *State v. Johnson*, 2002 WI App 166, ¶ 7, 256 Wis. 2d 871, 649 N.W.2d 284. The interpretation of a statute is a question of law which this court reviews de novo. *State v. Hughes*, 218 Wis. 2d 538, 543, 582 N.W.2d 49 (Ct. App. 1998). When we interpret a statute, our goal is to ascertain the intent of the legislature and give effect to the intent of the legislature. *State ex rel.*

*Frederick v. McCaughtry*, 173 Wis. 2d 222, 225, 496 N.W.2d 177 (Ct. App. 1992). We first look to the language of the statute itself. *Anderson v. City of Milwaukee*, 208 Wis. 2d 18, 25, 559 N.W.2d 563 (1997). If the language of the statute is unambiguous in its meaning, we go no further. We also apply "a cardinal rule of statutory interpretation . . . that statutes must be construed so as to avoid absurd results." *Wisconsin Citizens Concerned for Cranes and Doves v. DNR*, 2004 WI 40, ¶ 35, 270 Wis. 2d 318, 677 N.W.2d 612.

■■

¶ 13. After we settle on the scope of the trial court's authority to order restitution, we then turn to review a discretionary act, "[c]ircuit courts have discretion in deciding on the amount of restitution and in determining whether the defendant's criminal activity was a substantial factor in causing any expenses for which restitution is claimed." *Johnson*, 256 Wis. 2d 871, ¶ 7. "When we review a circuit court's exercise of discretion, we examine the record to determine whether the circuit court logically interpreted the facts, applied the proper legal standard and used a demonstrated, rational process to reach a conclusion that a reasonable judge could reach." *Id.*

STATUTES INVOLVED

¶ 14. Restitution is governed by WIS. STAT. § 973.20. It provides, in relevant part:

> (1r) When imposing sentence or ordering probation for any crime . . . for which the defendant was convicted, the court . . . shall order the defendant to make full or partial restitution under this section to any victim of a crime considered at sentencing . . . unless the court finds substantial reason not to do so and states the reason on the record . . . .

(2) If a crime considered at sentencing resulted in damage to or loss or destruction of property, the restitution order may require that the defendant:

. . . .

(b) If return of the property [to the owner or owner's designee] is impossible, impractical or inadequate, pay the owner or owner's designee the reasonable repair or replacement cost or the greater of:

1. The value of the property on the date of its damage, loss or destruction; or

2. The value of the property on the date of sentencing, less the value of any part of the property returned, as of the date of its return. The value of retail merchandise shall be its retail value.

.

(5) In any case, the restitution order may require that the defendant do one or more of the following:

(a) Pay all special damages, but not general damages, substantiated by evidence in the record, which could be recovered in a civil action against the defendant for his or her conduct in the commission of a crime considered at sentencing.

¶ 15. Because the restitution statute does not define the term "victim," we turn to Wis. Stat. § 950.02(4)(a), which is a related statute. *Johnson*, 256 Wis. 2d 871, ¶ 17. Section 950.02(4)(a)1. provides that "victim" means "[a] person against whom a crime has been committed."

DISCUSSION

██

¶ 16. Case law arising under the restitution statute informs us that there are two components to the question of whether restitution can be ordered. First,

the claimant of restitution must be a "direct victim" of the crime. Second, there must be a causal connection between the defendant's conduct and harm suffered by the claimant.

*Direct Victim Component*

¶ 17. To answer the first component of the analysis, we are required to determine who is "a person against whom a crime has been committed." In *State v. Vanbeek*, 2009 WI App 37, 316 Wis. 2d 527, 765 N.W.2d 834, we discussed who is a "direct victim" of a crime. Vanbeek left a bomb scare note in a lunch room threatening to harm school property, forcing the school district to evacuate students and staff to another location. *Id.*, ¶¶ 2, 12. After Vanbeek was found guilty of making a bomb scare, the school district sought restitution, including the salaries and benefits of teachers and staff. *Id.*, ¶ 3. We affirmed the circuit court's order for restitution.

¶ 18. In opposing restitution, "Vanbeek argue[d] that the persons occupying the school were the direct victims of his crime, and that the school district was only collaterally impacted." *Id.*, ¶ 8. We rejected his attack:

> This argument misses the mark. Vanbeek conveyed a false threat to destroy school district property, which resulted in an evacuation and a direct loss to the school district. There is no doubt that the conduct involved in the crime considered at sentencing—conveying a threat to destroy school district property by means of explosives—was directed at the school district. Vanbeek left the bomb scare note on school district property and the note threatened to destroy school district property.

*Id.*, ¶ 12.

¶ 19. Hoseman makes an argument similar to Vanbeek's that the Burbeys were not directly impacted by the manufacture of marijuana:

[T]he defendant was not convicted of any crime related to the damage of property. The offense of manufacturing with intent to deliver THC is not a crime committed against or directed against the homeowners, and thus, under Wisconsin law, the homeowners should not have been awarded restitution under WIS. STAT. § 973.20.

¶ 20. Like Vanbeek, Hoseman relies on cases that considered "whether the government (on behalf of law enforcement agencies) or police officers were direct victims, and we determined that the government claimant was not a direct victim entitled to restitution." *Vanbeek*, 316 Wis. 2d 527, ¶ 8. He argues that *State v. Ortiz*, 2001 WI App 215, 247 Wis. 2d 836, 634 N.W.2d 860, "hammers home how stringent Wisconsin courts have delineated between direct victims" and "closely related parties." In *Ortiz* we rejected a city's request for restitution of overtime costs incurred in mobilizing a SWAT team to arrest Ortiz who refused to come out of his house. *Id.*, ¶¶ 1–7. We held that the police officers were the direct victims of Ortiz's criminal conduct and not the city:

> [T]he fact remains that it was the police, not the city, who were the direct and actual victims of Ortiz's crimes. Ortiz did not threaten to injure the city—he threatened to injure the police officers. Ortiz did not fail to comply with an attempt by the city to take him into custody—he failed to comply with the police effort to take him into custody. Ortiz did not obstruct the city—he obstructed the police. And finally, Ortiz's disorderly conduct was not targeted at the city—it was targeted at the police.

*Id.*, ¶ 22.

¶ 21. Hoseman also relies on *State v. Lee*, 2008 WI App 185, ¶¶ 2, 12, 314 Wis. 2d 764, 762 N.W.2d 431, where we held that a police officer who was injured

chasing the defendant from the scene of an armed burglary and armed robbery was not a direct victim because he was not the target of the crime of conviction. He argues that *Lee* supports his thesis that because he was not charged with damaging the Burbeys' property, they are not the direct victims of the crime of conviction.

¶ 22. Finally, he cites to *State v. Schmaling*, 198 Wis. 2d 756, 762, 543 N.W.2d 555 (Ct. App. 1995) ("The crimes Schmaling was convicted of consisted of second-degree reckless homicide and four counts of second-degree recklessly endangering safety, none of which were committed against Racine County. Therefore, requiring Schmaling to pay restitution to Racine County, which has no relationship to the crimes he committed, would be improper."). To further support his argument, Hoseman states that "the record does not indicate that there was any direct victim to the crime sentenced upon, in that there was no evidence presented of any purchasers of the defendant's THC product."

■

¶ 23. The cases Hoseman relies upon are inapposite under the facts of this case; they stand for the proposition that governmental entities are not entitled to restitution for collateral expenses incurred in the normal course of law enforcement. *See State v. Haase*, 2006 WI App 86, ¶ 10, 293 Wis. 2d 322, 716 N.W.2d 526. Hoseman is convicted of conspiracy to manufacture marijuana; in furtherance of that conspiracy, Hoseman rented the Burbeys' residence using a ruse, he converted two upstairs rooms into grow rooms for hydroponic growing equipment, he allowed exhaust gases to vent directly into the residence, he ran hoses and electrical wiring up the stairs, and he drained chemicals into the toilets and sinks of the residence. This is not

similar to the situation in *Ortiz* where the city tried to ride on the coattails of the police officers who were the targets of Ortiz's criminal conduct. Likewise, this is not similar to *Lee* where the police officer's injury was collateral damage arising after the crime of conviction was committed. And *Schmaling* is inapposite because, in that, the cleanup after the fire was collateral to the accident. What distinguishes this case from those relied upon by Hoseman is the Burbeys, as owners of the residence, were the direct targets of the conspiracy to manufacture marijuana; it was their residence that was altered and made uninhabitable to further the goal of the conspiracy. If the alterations to the Burbeys' residence had not been made, Hoseman and his co-conspirators could not have manufactured marijuana. The alterations are not collateral to the manufacture of marijuana, they are integral. As the Burbeys' attorney so eloquently argued, the house "was not rented to operate a marijuana greenhouse. It was operated as a residential rental. It was a home. They used my clients' house, water, electricity, heat, all of the equipment, the fixtures, everything in my clients' house for that enterprise. That makes my client[s] [] victim[s]."

¶ 24. The Washington Court of Appeals reached the same result in *State v. Coe*, 939 P.2d 715 (Wash. Ct. App. 1997). Like Hoseman, Coe argued "that growing marijuana is a 'victimless' crime and that the State's failure to charge him with vandalism or some other crime that includes an element of property damage makes restitution inappropriate." *Id.* at 716. The court promptly rejected this argument because there was substantial evidence establishing that Coe made "unauthorized alterations to the house's electrical and ventilation systems to facilitate the manufacture of marijuana." *Id.* Similar to Coe, Hoseman made unauthorized

alternations to the residence in order to construct and operate a hydroponic growing operation.

*Causation Component*

¶ 25. Having concluded that the Burbeys were direct victims of the conspiracy to manufacture marijuana, we turn to the second component of our analysis —whether there is a causal connection between the defendant's entire course of conduct and harm suffered by the claimant. The Washington Court of Appeals answered that in the affirmative in *Coe*:

> Because the damage to [the victim's] house would not have occurred but for Coe's marijuana growing operation, we hold that there was a sufficient causal connection between the crime charged and the victim's damage. Further, because dry-rot, mold, and mildew damage were foreseeable consequences of venting warm moist air into the unheated apartment, we hold that restitution was appropriate here.

*Id.* (citations omitted).

¶ 26. We likewise answer the second component in the affirmative. Before restitution can be ordered in Wisconsin, there must be a showing that a defendant's criminal conduct was a substantial factor in causing economic loss to the victim. *State v. Longmire*, 2004 WI App 90, ¶ 13, 272 Wis. 2d 759, 681 N.W.2d 534. "Put another way, we have said that a causal link for restitution purposes is established when 'the defendant's criminal act set into motion events that resulted in the damage or injury.' " *Id.* (citation omitted).

¶ 27. At the restitution hearing, the Burbeys were represented by private counsel and developed an extensive record detailing the damage to their residence and

the costs of repairing that damage. We have previously summarized the extensive damage to the Burbeys' residence that made it uninhabitable, *see supra* ¶ 7, and Hoseman does not seriously challenge the inescapable conclusion that the actions taken in furtherance of the conspiracy to manufacture marijuana caused the damage to the residence.

CONCLUSION

¶ 28. Our analysis of whether restitution is proper under the facts of this case required us to determine if (1) the Burbeys were "direct victims" of Hoseman's participation in a conspiracy for the manufacture of marijuana and

(2) there is a causal connection between all of Hoseman's activities and the damage to the Burbeys' residence. We answer both of those components in the affirmative. Hoseman's unauthorized alterations to the residence and unauthorized operation of a marijuana growing operation were integral to the damages that rendered the residence uninhabitable. And Hoseman's conduct of turning an 1885 Victorian home into a twenty-first century hydroponic marijuana growing operation was the substantial factor in causing the damages incurred by the Burbeys.

*By the Court.*—Judgment affirmed.